*CONTAINS* ▮▮▮▮▮ *INFORMATION*

FILED WITH THE
COURT SECURITY OFFICER
CSO ~~~~
DATE: 8/18/09

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHAWALI KHAN,

Petitioner,

v.

BARACK H. OBAMA, et al.,

Respondents.

Civil Action No. 08-1101 (JDB)

## MEMORANDUM OPINION

Shawali Khan, an ▮▮▮ citizen, has been in U.S. custody since mid-November 2002.
He has been detained at Guantanamo Bay, Cuba since early 2003; and on June 25, 2008, he filed
a petition for a writ of habeas corpus in this Court. After several months of preliminary motions
and hearings, the Court entered a Case Management Order ("CMO") on February 20, 2009. The
CMO in petitioner's case is slightly different than the CMOs in most other cases involving
Guantanamo detainees. According to petitioner, extensive discovery is unnecessary in this case
because respondents have not produced sufficient reliable evidence to justify his detention.
Hence, petitioner sought -- and received -- an "expedited" CMO, which provided him with an
opportunity to file a motion for judgment on the record before full discovery had been
conducted. That motion is now before the Court. The motion has been fully briefed and the
Court held a hearing on June 12, 2009. For the reasons explained below, petitioner's motion will
be denied.

## ANALYSIS

Respondents bear the initial burden of producing sufficient credible evidence to justify an

*CONTAINS* ▮▮▮▮▮▮▮ *INFORMATION*

individual's detention at Guantanamo. "[O]nce the Government puts forth credible evidence that

the habeas petitioner meets the . . . criteria [for detention], the onus . . . shift[s] to the petitioner

to rebut that evidence with more persuasive evidence that he falls outside the criteria." Hamdi v.

Rumsfeld, 542 U.S. 507, 534 (2004); see also Parhat v. Gates, 532 F.3d 834, 847 (D.C. Cir.

2008).[1] The question presented here is whether respondents have satisfied their initial burden. If

they have not, then the "onus" will not shift to petitioner and his habeas petition will be granted.

But if respondents have met their initial burden, then petitioner's motion for judgment on the

record must be denied and the discovery phase of this litigation will commence.

As a threshold matter, the Court must bear in mind that -- for the purpose of this motion

-- petitioner has adopted the standard for detention proposed by respondents. Pet'r's Mem. at 16.

On March 13, 2009, respondents proposed the following standard:

> The President has the authority to detain persons that the President
> determines planned, authorized, committed, or aided the terrorist
> attacks that occurred on September 11, 2001, and persons who
> harbored those responsible for those attacks. The President also has
> the authority to detain persons who were part of, or substantially
> supported, Taliban or al-Qaida forces or associated forces that are
> engaged in hostilities against the United States or its coalition
> partners, including any person who has committed a belligerent act,
> or has directly supported hostilities, in aid of such enemy armed
> forces.

See Resps.' Rev. Mem. Re: Detention Authority. The Court must put aside, for now, the analysis

of respondents' definition that was conducted in this Court's May 19, 2009 Memorandum

---

[1] Respondents attached a classified version of Parhat to their opposition to petitioner's
motion. The Court will only refer to the classified version of Parhat when necessary and will cite
to the reported version of Parhat whenever possible.

▮▮▮▮▮▮▮▮▮▮▮▮▮

*CONTAINS* ▮▮▮▮▮▮▮ *INFORMATION*

Opinion, and will operate instead under respondents' March 13 proposed statement of its

detention authority.  Furthermore, for the purpose of this motion, petitioner "concedes . . . that

the allegations set forth against [him] in the factual return would, if they could be proven, make

[him] detainable under [respondents'] definition." Pet'r's Mem. at 16.

Petitioner's concessions narrow the analysis.  The only question remaining is whether

enough allegations are supported by reliable, credible evidence to justify petitioner's detention.

See id. at 18.  So framed, the Court must conduct a two-part inquiry.  First, it must scrutinize

respondents' evidence and determine what is reliable and what is not.  This examination

constitutes the majority of the analysis that follows.  The second step is determining whether the

reliable, credible evidence is sufficient to justify petitioner's detention under respondents'

definition of their authority to detain.

## I.  Assessment of Reliability

### A.  General Principles

The Federal Rules of Evidence do not apply strictly in these Guantanamo habeas cases.

Instead, courts must be flexible in evaluating the evidence presented by the parties.  See Hamdi,

542 U.S. at 539.  "Hearsay, for example, may need to be accepted as the most reliable available

evidence from the Government in such a proceeding." Id. at 533-34.  And given "the exigencies

of the circumstances," "the Constitution would not be offended by a presumption in favor of the

Government's evidence, so long as that presumption remained a rebuttable one and fair

opportunity for rebuttal were provided." Id.

-3-

*CONTAINS* ███████████ *INFORMATION*

Even under relaxed evidentiary standards, however, the credibility or reliability of the

evidence must be assessable by a court lest the presumptions in favor of respondents become

irrebuttable. Parhat, 532 F.3d at 847. The interplay between the presumptions and the

requirement of reliability was squarely addressed in Parhat.[2] Respondents in that case relied on

various forms of evidence, including "four U.S. government intelligence documents" that

purportedly showed that a certain group was "associated with" al Qaeda or the Taliban and was

engaged in hostilities against the United States or its coalition partners. Id. at 844, 846; see

also Parhat, classified slip op. at 19-24 (describing the four intelligence documents). The D.C.

Circuit held that the four intelligence documents were not reliable enough to justify the

petitioner's detention. The court first noted that the documents were not definitive in their

conclusions -- they repeatedly stated that a particular activity "reportedly" occurred and that

something "may" be true.[3] Parhat, 532 F.3d at 846. Moreover,

---

[2] Respondents attempt to distinguish Parhat because it involved review of a determination made by a Combatant Status Review Tribunal (CSRT), not a habeas proceeding, and that more "flexible" procedures are permitted in habeas proceedings such as these. See Resps.' Opp. at 15. This distinction is unconvincing. The Supreme Court has held that CSRT proceedings are not sufficiently rigorous to qualify as an adequate substitute for habeas. See Boumediene v. Bush, 128 S. Ct. 2229, 2271-74 (2008). Hence, as Parhat itself recognized, respondents' evidence is subject to more stringent requirements in a habeas proceeding than in review of a CSRT determination. See Parhat, 532 F.3d at 851 ("[T]he habeas proceeding will have procedures that are more protective of [petitioner's] rights than those available under the [Detainee Treatment Act].").

[3] Respondents point out that Parhat involved "finished" intelligence reports whereas the present case involves "raw" intelligence reports. See Resps.' Opp. at 15-16. Parhat, respondents maintain, is thus distinguishable. But, as discussed in greater detail below, the flaws the Parhat court identified are not unique to finished intelligence reports, so this distinction, if it is a difference at all, certainly does not make Parhat inapplicable here.

-4-

*CONTAINS* ▮▮▮▮▮▮▮ *INFORMATION*

in virtually every instance, the documents do not say who
"reported" or "said" or "suspected" those things. Nor do they
provide any of the underlying reporting upon which the documents'
bottom-line assertions are founded, nor any assessment of the
reliability of that reporting. Because of those omissions, the
Tribunal could not and this court cannot assess the reliability of the
assertions in the documents. And because of this deficiency, those
bare assertions cannot sustain the determination that [petitioner] is
an enemy combatant.

Id. at 846-47. The court reached this conclusion because "[i]f a Tribunal cannot assess the

reliability of the government's evidence, then the 'rebuttable' presumption becomes effectively

irrebuttable." Id. at 847 (citing Bismullah v. Gates, 501 F.3d 178, 186 (D.C. Cir. 2007)).

Respondents in Parhat offered two reasons why identifying the sources of information

was unnecessary to assess reliability. Each was rejected by the court. First, the court considered

respondents' contention that "assertions in the intelligence documents are reliable because they

are made in at least three different documents." Id. at 848. The court rejected the argument,

observing that "the fact that the government has 'said it thrice' does not make an allegation true."

Id. (quoting Lewis Carroll, The Hunting of the Snark 3 (1876)). Indeed, the court noted that all

of the documents making a particular allegation "may ultimately derive from a single source."

Id. at 849. Second, the court considered respondents' contention "that the statements made in the

documents are reliable because the State and Defense Departments would not have put them in

intelligence documents were that not the case." Id. The court dismissed this argument as well,

writing that "[t]his comes perilously close to suggesting that whatever the government says must

be treated as true." Id.

-5-

*CONTAINS* ███████████ *INFORMATION*

Hence, <u>Parhat</u> contemplates the following decisional framework.  First, courts must determine whether the evidence relied upon contains enough information to permit an assessment of reliability.  If it does, then courts must examine that information and determine whether the evidence is in fact sufficiently reliable to be used as a justification for detention.  But if it does not contain enough information, and if it is not corroborated by otherwise reliable evidence, then courts are precluded from assessing the evidence's reliability.  And if courts cannot assess reliability, then the evidence in question is inherently unreliable and may not be relied upon to justify detention.

What information, then, must respondents provide to permit courts to assess the reliability of evidence gathered during intelligence operations?  The Declaration of ████ ███████████ attached to respondents' factual return, provides some insight.  To evaluate the credibility of human intelligence, collectors of intelligence look at "two broad areas."  ███████████ Decl. at 8.  First, they look at an intelligence report's ████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

██████████████ <u>Id.</u> at 8-9.  Second, intelligence collectors examine ████████

████████████████████████████████████████████████████

██████████████ <u>Id.</u> at 9.  These principles -- set out by respondents themselves -- provide the best set of criteria for a court to use to determine whether the raw intelligence reports

-6-

████████████████████████████████

*CONTAINS* ███████████ *INFORMATION*

respondents rely upon to justify petitioner's detention are reliable and credible.

In sum, these Guantanamo habeas proceedings require greater flexibility than normal

civil or criminal proceedings. But under Parhat, courts must still be able to assess the reliability

and credibility of the evidence respondents rely upon to justify detention. The mere fact that the

intelligence community relies upon a certain kind of information does not relieve courts of their

duty independently to assess the evidence. The ███████████ Declaration aids courts in

carrying out this duty because it sets out criteria that intelligence collectors themselves look to in

assessing the reliability or credibility of intelligence documents. If the evidence respondents rely

upon to justify detention does not provide enough information to permit assessment of the

███████████ factors -- or only does so in a way that nonetheless precludes a court from

assessing the reliability of the evidence -- then the evidence cannot be relied upon to justify

detention. With these principles in mind, the Court will proceed with its analysis of the evidence

in this case.

*B. Analysis of Respondents' Evidence*

Respondents rely on four categories of evidence. First are reports of petitioner's own

statements, including a transcript of Administrative Review Board ("ARB") proceedings.

Petitioner only challenges the reliability of two essentially identical reports, both stemming from

a February 17, 2003 interview of him. See Pet'r's Rep. at 2-3. The contents of those two

interview reports are not material to the resolution of petitioner's motion, and he concedes that

the remaining interview reports may be deemed reliable at this stage of the proceedings. Id.

-7-

*CONTAINS* ███████████ *INFORMATION*

Second are twelve "raw intelligence reports" concerning petitioner.[4] He challenges the reliability of all of these reports under Parhat because they all contain at least some level of hearsay and the sources for the reports are confidential. See id. at 5-8. Third are six reports cataloging materials allegedly found in petitioner's home. Petitioner challenges the reliability of these reports as well. Id. at 4-5. The final category is reports of statements made by other detainees. Only one document falls into this category. See ISN 850 FD-302 (May 28, 2003). But it does not advance respondents' case for petitioner's detention, and he does not challenge its reliability.

1. Raw Intelligence Reports

The initial step in analyzing the raw intelligence reports is determining which, if any, have sufficient hallmarks of reliability -- as set out in the ███████████ ███████████ -- to allow the Court to assess their reliability and credibility. Reports lacking those hallmarks of reliability -- which, as discussed below, is all of the reports -- are inherently unreliable under Parhat and may not be relied upon to justify detention.[5] Two crucial deficiencies -- although not the only ones -- in the reports are that they contain multiple levels of hearsay and all sources are

---

[4] Fourteen raw intelligence reports are attached to the factual return. But two of those have nothing to do with petitioner. See ███████████████████████████████
███████████

[5] This determination should not be interpreted as a holding that raw intelligence reports such as ███████████████████ and ███████████████ are categorically unreliable. As respondents point out, ███████ ███████ are similar to Federal Bureau of Investigation FD-302 documents, which are often used as evidence. See Resps.' Opp. at 10 (citing, inter alia, Moore v. Ashcroft, 401 F. Supp. 2d 1, 12 (D.D.C. 2005)). Indeed, one ███ respondents apparently have attached to petitioner's factual return by mistake -- ███████
███████████████████ -- contains detailed information about the source and his placement. Such a raw intelligence report might well be reliable under the standards set forth in Parhat.

-8-

*CONTAINS* ▮▮▮▮▮▮ *INFORMATION*

confidential (i.e., unidentified). But, as respondents point out, even if particular evidence is

unreliable standing alone, it may nonetheless be reliable if corroborated by other reliable

evidence. See Rugendorf v. United States, 376 U.S. 528, 533 (1964) (holding that an affidavit in

support of a search warrant containing hearsay from a confidential source may be reliable "so

long as there was a substantial basis for crediting the hearsay"); see also Parhat, 532 F.3d at 849

("[T]here may well be other forms in which the government can submit information that will

permit an appropriate assessment of the information's reliability while protecting the anonymity

of a highly sensitive source.").

　　　Hence, once the Court has determined that none of the raw intelligence reports are

reliable on their own, it must still assess whether other reliable evidence adequately corroborates

the allegations made in those reports. In making this latter determination, the Court will bear in

mind the procedural posture of this case. The question now presented is whether respondents

have satisfied their initial burden of justifying petitioner's detention. Petitioner argues in favor of

a standard akin to the Fed. R. Civ. P. 56 summary judgment standard. See Pet'r's Mem. at 17.

Such a standard might be appropriate once discovery has transpired. Here, however, petitioner

requested and received an "expedited" CMO that permitted him to file a motion for judgment on

the record before discovery has occurred. Because he contends that respondents have failed to

meet their initial burden of justifying his detention, the present motion is more like a motion to

dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). In any event, inferences are

drawn in favor of the non-movant for both motions for summary judgment and motions to

-9-

*CONTAINS* █████████ *INFORMATION*

dismiss. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (summary judgment);

Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (motion to dismiss). So, for the purpose of this

motion, the Court will draw inferences on all disputed issues in respondents' favor.

   *a. Report-by-Report Analysis*



████████████████████ This report states that petitioner's ████ [6] ███████

was active in Hezb-i-Islami Gulbuddin ("HIG"), and that HIG has taken actions to harm U.S.

forces. The source for the report is a "senior level Afghan tribesman" with "indirect access due

to his position" and whose reliability is "yet to be determined." No other information is provided

in the source description. The report does not explain why the source had indirect access to this

information, what kind of control the collector had over the source, or what kind of motivation or

wittingness the source had when making the statement. See ████████ Decl. at 8-9.

Nor does the report provide any "context statement" regarding the circumstances in which the

information was obtained. See id. at 9. The report thus bears none of the hallmarks of reliability

that the intelligence community itself looks to in assessing the reliability of raw, human

intelligence. Absent such indicia of reliability, this Court cannot assess the report's reliability.

Hence, under Parhat, unless other reliable evidence corroborates the information contained in the

report, it may not be used to justify petitioner's detention.

---

   [6] Most of the materials attached to petitioner's factual return refer to ████ as petitioner's
████ In one statement, however, petitioner avers that ████ is not his ████ but instead is his
████████████████████ See ████

-10-

*CONTAINS* ▮▮▮▮▮▮▮▮ *INFORMATION*

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ According to this report, which does not mention

petitioner, a HIG cell in Kandahar was responsible for explosions near the Kandahar airfield in

October 2002. HIG had reportedly conducted surveillance of U.S. vehicles and devised a plan

for attacking them. The source for the report is an "Afghan civilian" who obtained the

information during the "normal course of daily activities," had "direct access," and whose

reliability is "yet to be determined." ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ Like those reports, it is lacking the indicia of reliability set forth in the

▮▮▮▮▮▮ Declaration, and it therefore cannot be relied upon absent corroboration by

other evidence.

▮▮▮▮▮▮▮▮▮▮ A small HIG cell entered Kandahar, according to this

-11-

*CONTAINS* ██████████ *INFORMATION*

report, and petitioner was a communicator and used a radio in his ██████ to communicate

between various HIG elements. The report also details various terrorist activities undertaken by

██████ and another man affiliated with HIG, ████████ Like the report immediately above, the

source is an "Afghan civilian" who obtained the information during the "normal course of daily

activities," had "direct access," and whose reliability is "yet to be determined." And hence, also

like the reports above, this report is lacking sufficient indicia of reliability for the Court to assess

its credibility.

████████████████████████████████████████ These reports

both describe a planned attack on U.S. vehicles. Neither mentions petitioner. The source for the

October 30 report is an "Afghan civilian" with "direct access" who obtained the information

during the "normal course of daily activities," whereas for the November 3 report the source is

an "Afghan government official" with "indirect access" who obtained the information during the

"normal course of official duties." The reliability for both sources is "yet to be determined."

These reports are flawed for the same reasons explained for the other reports above. Under

Parhat, neither report, standing alone, may be relied upon to justify petitioner's detention.

████████████████████████ This report states that petitioner first became involved

with HIG during the jihad against the former Soviet Union. It claims that petitioner then became

a HIG facilitator who used his ██████ in Kandahar to conduct meetings. The report also avers

that petitioner delivered a detonation device on November 9, 2002, which was to be used for

attacks against the United States. The source is an "Afghan government official" who obtained

-12-

*CONTAINS* ███████████ *INFORMATION*

the information during the "normal course of official duties," who has "indirect access," and

whose "reliability is yet to be determined." Like all of the reports described above, this report is

lacking sufficient hallmarks of reliability and hence cannot justify petitioner's detention absent

corroboration.

███████████████████ According to this report, petitioner was the leader of

a HIG propaganda group in Kabul, and an unnamed HIG and Taliban facilitator incited a protest

at the University of Kabul on November 11-12, 2002. The report also states that petitioner was

captured by U.S. forces on ███████████████. The source description for this

report is slightly different than the other reports discussed above. The source is an unnamed

███████████who obtained the information during the "course of official duties"

and had "indirect access." The source has "reported reliably in the past." But it is also stated

that the report contains "third-hand information, some of which has been verified through actual

reported events."[7] Although slightly different than the reports described above, this report

suffers from similar flaws. The unnamed ███████████has reported reliably, but

the report explicitly contains "third-hand information" with no reference to the source of that

information. And like the reports above, the report lacks a context statement, any information

about the collector's control over the source, or a description of the source's motivation or

wittingness. The Court cannot assess the reliability of this report, and, under Parhat, the report

therefore cannot be used to justify petitioner's detention.

---

[7] The report does not explain what information was verified through actual reported
events.

-13-

*CONTAINS* ███████████ *INFORMATION*

███████████████████████████████████ These reports

provide that ███ held a meeting after petitioner's capture. ███ was reportedly concerned about

the effectiveness of the HIG cell in Kandahar without petitioner, and was looking for whoever

had provided information leading to his capture. The source of both reports is an "Afghan

government official" who obtained the information during the "normal course of official duties,"

had "indirect access," and whose reliability is "yet to be determined." Like all of the other

reports, these two reports lack the ███████████ indicia of reliability, thus preventing the

Court from assessing their credibility.

███████████████████████ A HIG cell entered Kandahar on December 28,

2002, according to this report. It names the leader of the cell (not petitioner), and describes

petitioner as "a HIG extremist arrested by ███████████████. The report has

two sources, both "Afghan government officials" who obtained the information during the

"normal course of official duties" and had "indirect access." One source's reliability is "yet to be

determined" and the other is "fairly reliable." Although the report is slightly different than the

majority of reports above in that it provides that one source is "fairly reliable," it is still lacking

the critical hallmarks of reliability set forth in the ███████████ Declaration. Hence, like

the other reports, it cannot justify detention under Parhat unless some distinct reliable evidence

corroborates the facts contained in the report.

███████████████████████ According to this report, a personal phone book was

found on a driver who attempted to run through a checkpoint. The phone book contained an

-14-

*CONTAINS* ███████████ *INFORMATION*

entry for ███████ and listed a Saudi cell phone number. The report contains no

information whatsoever describing the source. The report is thus completely lacking indicia of

reliability and cannot be relied upon to justify detention absent further corroboration.

███████████████████ This report provides that members of HIG and al

Qaeda met on July 20, 2003 and agreed to attack U.S. forces. It does not mention petitioner.

Like many of the reports above, the source is an "Afghan government official" who obtained the

information during the "normal course of official duties," had "indirect access," and whose

reliability is "yet to be determined." And, like those other reports, the absence of the criteria set

forth in the ████████████Declaration bars this Court from assessing the reliability of the

report. Hence, unless the information contained in the report is independently corroborated,

respondents may not rely on this report to justify petitioner's detention.

\*        \*        \*        \*

In addition to the deficiencies described above, the reports, read together, contain another

crucial flaw: all of the information contained in the reports could come from a single individual.

No source is identified by name. To be sure, the source descriptions vary slightly: a "senior

level Afghan tribesman"; an "Afghan civilian"; or an "Afghan government official." But on the

record before the Court, those descriptions could all refer to the same person. The only report

that provides a different source description is ██████████, which states that the source is

an unnamed █████████████ but also states that the report contains "third-hand

information." The information provided in this report, then, could be from the same person

-15-

███████████████

*CONTAINS* █████████ *INFORMATION*

listed as the source in all of the other reports.

The D.C. Circuit confronted a similar problem in <u>Parhat</u>. The materials respondents

relied upon in that case also failed to identify the sources of allegations, and the court noted that

all of the documents making a particular allegation "may ultimately derive from a single source."

532 F.3d at 849.  When respondents argued that the court could find the allegations reliable

because similar allegations were made in multiple documents, the court noted that "the fact that

the government has 'said it thrice' does not make an allegation true."  <u>Id.</u> at 848 (quoting Carroll,

<u>The Hunting of the Snark</u> 3).  This Court agrees.  Unless respondents can demonstrate that

multiple sources were making similar allegations about petitioner, these raw intelligence reports

cannot corroborate one another.  But nothing in the current record suggests that the raw

intelligence reports relied upon here come from multiple sources.  Hence, only if other evidence

in the record corroborates the allegations contained in those reports may respondents rely upon

such allegations at this stage of the proceedings.

   b. *Corroboration for Allegations Made in Raw Intelligence Reports*

As respondents would have it, the raw intelligence reports, woven together, support the

following narrative: (1) petitioner was active in HIG during jihad against the former Soviet

Union, <u>see, e.g.,</u> ███████████ (2) HIG was and remains a terrorist organization, <u>see, e.g.,</u>

███████████; (3) petitioner's ████████ was a HIG commander, <u>see, e.g.,</u> ███████████

█; (4) petitioner was active in HIG as a communicator or facilitator at the time of his capture in

███████████ <u>see, e.g.,</u> ███████████; (5) ███████████████████████

-16-

*CONTAINS* ███████████ *INFORMATION*

████████████████████████████████████████████████████████

████████ (6) petitioner delivered a detonation device for attacks on U.S. forces, see ████

████████ (7) he was a HIG propaganda leader in Kabul, see ███████████; and (8) his

name was found in the personal phone book of a man who attempted to run through a U.S.

checkpoint, see ████████. As discussed in the preceding section, none of the raw

intelligence reports -- either individually or collectively -- contain enough information to permit

the Court to assess their reliability. In this section, the Court will examine whether other

evidence in the record -- such as petitioner's own statements -- corroborate any aspects of

respondents' narrative as drawn initially from the intelligence reports.

The first aspect -- that petitioner was active in HIG during jihad against the former Soviet

Union -- is amply corroborated by other reliable evidence. Although petitioner has occasionally

denied this charge, see, e.g., ████████████████, he has more often than not admitted

it, see, e.g., ISN FM-40 (Feb. 21, 2003). Likewise, HIG's characterization as a violent

organization, the second aspect of respondents' narrative, is also supported by independent,

reliable evidence. For example, the Declaration of ██████ a Senior Intelligence Analyst at

the ████████████ describes HIG's "30-year history of supporting jihad in

Afghanistan" and explains HIG's "important and deliberate role in supporting continued attacks

against coalition and Afghan forces throughout 2002." ████Decl. at 1-2. So, too, ████role as

a HIG commander has independent, reliable support. His precise role is subject to debate -- for

example, petitioner stated on one occasion that ████was only a HIG commander during jihad

-17-

*CONTAINS* ███████████ *INFORMATION*

against the former Soviet Union, see ARB Tr. at 5-6 -- but petitioner's admission that ███ has a

history as a HIG commander is sufficient, at this stage, to corroborate the raw intelligence

reports on this third aspect of respondents' narrative.

The fourth aspect of the narrative is petitioner's role in HIG at the time of his capture.

This is a crucial subject. Petitioner's continuing involvement in HIG is mentioned in two of the

raw intelligence reports, see ████████ and ████████, and alluded to in two

others, see ████████ and ████████ Of course, an allegation does not become

reliable merely because it is supported by several unreliable reports. See Parhat, 532 F.3d at

848; cf. Ali Ahmed v. Obama, Civ.A.No. 05-1678, unclassifed slip op. at 11-12 (May 11, 2009)

("[T]he mosaic theory is only as persuasive as the tiles which compose it and the glue which

binds them together -- just as a brick wall is only as strong as the individual bricks which support

it and the cement that keeps the bricks in place. Therefore, if the individual pieces of a mosaic

are inherently flawed or do not fit together, then the mosaic will split apart, just as the brick wall

will collapse."). But other, more reliable, evidence also lends some credence to this aspect of

respondents' narrative, at least at this early stage of the proceedings. ████████

████████████████████████ See

ISN 899 FM-40 (Feb. 7, 2003), ISN 899 FM-40 (Feb. 21, 2003), and ████████

███ but see ████████████████ This admission

corroborates respondents' allegation that petitioner was once a HIG communicator, albeit twenty

or more years before his capture. To be sure, petitioner denies the allegation that he was a HIG

-18-

UNCLASSIFIED//FOR PUBLIC RELEASE

*CONTAINS* ███████████ *INFORMATION*

communicator at the time of his capture. Moreover, the Court will not adopt a "once a HIG

communicator, always a HIG communicator" approach. But at this stage of the proceedings, the

Court must draw inferences in respondents' favor, and inferring that petitioner remained a HIG

communicator from the fact that he once was a HIG communicator (and his ███ has a history

as a HIG leader) does not require a fertile imagination. Hence, petitioner's admissions that he

once was a HIG radio operator serve to corroborate that he also was one at the time of his

capture in ████████████ The Court does not intimate that there is strong support for that

conclusion. But at this time and with all inferences drawn in respondents' favor, there is

sufficient corroboration to rely on that assertion.

The remaining four aspects of respondents' narrative, however, are entirely lacking in

corroboration. ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ neither

in petitioner's statements nor corroborative evidence elsewhere. Similarly, the only source of

respondents' assertion that petitioner delivered a detonation device for attacks on U.S. forces is a

single, unreliable raw intelligence report. See ████████████. The same holds true for

respondents' claims that petitioner was a HIG propaganda leader in Kabul, see ████████████

██, and that petitioner's name was found in the personal phone book of a man who attempted to

UNCLASSIFIED//FOR PUBLIC RELEASE

*CONTAINS* ███████████ *INFORMATION*

run through a U.S. checkpoint, see ███████████. Lacking any corroboration, these reports

must stand on their own. But because they lack the information the Court needs to gauge their

reliability, the allegations in the reports cannot be used to justify petitioner's detention. See

Parhat, 532 F.3d at 847-48. Hence, none of these last four aspects of respondents' narrative are

reliable enough for respondents, and hence this Court, to rely on them in justifying petitioner's

detention.

In sum, of the eight aspects of respondents' narrative set out above, only half may be used

to justify petitioner's detention at this stage of the proceedings. The allegations ███████████

███████████████████████████████ that HIG was a terrorist

organization at the time of petitioner's capture, that ████ was a HIG commander, and that

petitioner was active in HIG as a communicator at the time of his capture are sufficiently

corroborated for respondents to rely upon them at this stage of the proceedings. Because the

remaining allegations are not supported by reliable evidence, the Court will not consider those

assertions in resolving petitioner's motion for judgment on the record.

2. Materials Found in Petitioner's Home

Six reports from the so-called ██████ database describe materials found in

petitioner's home after his capture in ████████ The first describes an Arabic notebook

containing information regarding assassinations and a plan to kidnap the President of the United

States. ██████████. The notebook also contains information regarding intelligence,

surveillance, and counterfeiting. The second report describes a book of poetry (in Arabic)

-20-

*CONTAINS* ███████████ *INFORMATION*

written by Abu Hafs, an al Qaeda leader. ███████████. Third is a report cataloging

money worth about 50 cents. ███████████ The fourth report describes Persian or Farsi

documents that appear to be someone else's personal documents, but also contain information

about land mine recognition. ███████████ Fifth is a report about an Arabic notebook

describing the use of several kinds of weapons. According to the report, the first page of the

notebook "has the name of ███████████ who's most likely to be the owner of this

notebook." ███████████. The final report describes Pushtu music in praise of the

Taliban. ███████████.

    Petitioner contends that these reports are unreliable for the same reasons the raw

intelligence reports are unreliable. But raw intelligence reports are "human intelligence"

whereas these reports describe physical items found in petitioner's home. Therefore, the same

███████████ hallmarks of reliability analysis does not apply. ███████████

███████████████████████████████ See, e.g., ███

███████████ ███████████████████████

███. Id. But he does not deny that these materials were found in his home. The reason he

possessed these materials, then, requires a credibility determination that this Court cannot make

at this stage of the proceedings. Hence, because the reports of physical items found in

petitioner's home are not inherently unreliable in the same way the other raw intelligence reports

are, respondents may rely on these reports at this stage of proceedings to justify petitioner's

detention.

-21-

*CONTAINS* ▆▆▆▆▆▆ *INFORMATION*

## II. Reliable Evidence to Justify Petitioner's Detention

To determine whether respondents have provided sufficient reliable evidence to satisfy

their initial burden of justifying petitioner's detention, the Court will apply respondents' standard

for their authority to detain,[8] under which a person who was "part of, or substantially supported,

Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United

States or its coalition partners, including any person who has committed a belligerent act, or has

directly supported hostilities, in aid of such enemy armed forces" may be detained. See Resps.'

Rev. Mem. Re: Detention Authority. As discussed above, the reliable evidence presented by

respondents to justify petitioner's detention is as follows: petitioner was active in HIG during

jihad against the former Soviet Union; HIG was a terrorist organization at the time of petitioner's

capture; ▆▆▆ was a HIG commander; petitioner was a HIG communicator at the time of his

capture; and petitioner possessed some al Qaeda- or Taliban-related material at the time of his

capture. Additionally, petitioner has stated that he was conscripted by the Taliban in the late

1990s and worked as a guard and laborer for two months. See ISN 899 FM-40 (Feb. 7, 2003);

see also ARB Tr. at 3-4.

The question, then, is whether this evidence is sufficient for respondents to meet their

initial burden of demonstrating that petitioner's detention is justified. The Court determines that

it is. Respondents have provided enough evidence to show that HIG qualifies as an "associated

force[] . . . engaged in hostilities against the United States or its coalition partners." See ▆▆▆

---

[8] As discussed previously, petitioner has accepted respondents' statement of the detention
authority for the purpose of the present motion. Pet'r's Mem. at 16.

-22-

*CONTAINS* ███████████ *INFORMATION*

Decl. at 2 ("HIG [has] played an important and deliberate role in supporting continued attacks

against coalition and Afghan forces throughout 2002."). And respondents have provided enough

credible, reliable evidence to show that petitioner was "part of" HIG in that he was a

communicator or facilitator at the time of his capture. <u>See</u> ███████████ (describing

petitioner as a HIG facilitator who conducts meetings in his ██████), ███████████

(describing petitioner as a HIG radio communicator), ███████████ (describing petitioner as

a HIG facilitator), and ███████████ (describing██ concern that HIG would be less

effective in Kandahar after petitioner's capture); <u>see also</u> ISN 899 FM-40 (Feb. 7, 2003)

(admitting he was a radio operator during jihad again the former Soviet Union), ISN 899 FM-40

(Feb. 21, 2003) (same), and ███████████ (same). Hence, this evidence supports

the conclusion that petitioner was "part of, or substantially supported" HIG, which is associated

with al Qaeda or the Taliban in hostilities against the United States. On that basis, petitioner's

motion for judgment on the record must fail.

## CONCLUSION

To be clear, the Court offers no opinion at this stage of the proceedings as to whether this

evidence and these allegations are ultimately sufficient to justify petitioner's detention under the

Court's May 19, 2009 interpretation of respondents' authority to detain. Similarly, the Court

offers no opinion as to petitioner's credibility or the ultimate inferences that it will draw from the

evidence as presented. The Court only holds that although much of respondents' evidence is

fatally lacking adequate indicia of reliability, the evidence that remains is sufficient -- under

-23-

UNCLASSIFIED//FOR PUBLIC RELEASE

*CONTAINS* ████████████ *INFORMATION*

respondents' previous interpretation of their authority to detain -- to warrant denial of petitioner's

motion. Accordingly, petitioner's motion for judgment on the record will be denied. A separate

order accompanies this opinion.


_____/s/_____
JOHN D. BATES
United States District Judge

Date:    July 31, 2009

UNCLASSIFIED//FOR PUBLIC RELEASE