SECRET//NOFORN

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Filed with Classified
Information Security

CISO _____

Date _____9/2/19_____

SHAWALI KHAN,

Petitioner,

v.

BARACK OBAMA, et al.,

Respondents.

Civil Action No. 08-1101 (JDB)

## MEMORANDUM OPINION

Shawali Khan, a citizen of Afghanistan, has been in United States custody since mid-November 2002, and has been detained at the United States Naval Base at Guantánamo Bay, Cuba since early 2003. Contending that he was unlawfully detained under the September 18, 2001 Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224 (2001), Khan filed a petition for a writ of habeas corpus in 2008. After several years of discovery, briefing, and a three-day evidentiary hearing, this Court denied Khan's petition, concluding that it was more likely than not that Khan was "part of" Hezb-i-Islami Gulbuddin ("HIG"), an "associated force" of the Taliban and al-Qaeda in hostilities against the United States and its coalition partners and, hence, that Khan was lawfully detained under the AUMF. The D.C. Circuit affirmed.

Now before the Court is Khan's motion for post-judgment relief under Federal Rule of Civil Procedure 60(b). Khan argues that subsequent developments have weakened the government's case for detention and that, therefore, the Court should vacate its prior judgment and reopen these proceedings. Although the government's case for Khan's detention has been weakened slightly by recent developments, it remains more likely than not that Khan was "part

SECRET//NOFORN

1

SECRET//NOFORN

of" forces associated with the Taliban and al-Qaeda at the time of his capture. In addition, Khan's motion fails to clear the high bar required to obtain post-judgment relief under Rule 60(b). For these reasons, Khan's detention remains lawful, and his motion will be denied.

## BACKGROUND

### I.    Factual Background

It is undisputed that Shawali Khan is a citizen of Afghanistan, who, at the time he was captured in November 2002, was living in the Kandahar region and managing a small oil shop. Other than that, the parties disagree on almost every relevant fact in this case. So, the Court will offer a broad summary of the factual narratives offered by each side.

#### A.    The government's narrative: Khan was a member of an HIG cell.

According to the government: Khan's connections to HIG date back to the time of the Soviet invasion of Afghanistan in the 1980s. Khan v. Obama, 655 F.3d 20, 21 (D.C. Cir. 2011) ("Khan III"); see also Khan v. Obama, 646 F. Supp. 2d 6, 17 (D.D.C. 2009) ("Khan I") (Khan "was active in HIG during jihad against the former Soviet Union"). Khan allegedly worked as a radio operator in a unit commanded by his uncle, Zabit Jalil, fighting with the mujahideen in the anti-Soviet jihad. Khan III, 655 F.3d at 21. After HIG's founder, leader, and namesake, Gulbiddin Hekmatyar, returned to Afghanistan from his exile in Iran after September 11, 2001, HIG joined forces with al-Qaeda and the Taliban to fight United States and coalition forces operating in Afghanistan. See id.; see also May 13, 2010 Hr'g Tr. 108:15-17 (Testimony of Prof. Brian Williams) ("[P]ost 9/11, when you have this burying of the hatchet between the Taliban . . . and HIG, you also have the sort of burying of the hatchet with Bin Laden and al-Qaeda."). Around that same time period, as reported by various U.S. intelligence collectors, a

SECRET//NOFORN

SECRET//NOFORN

handful of Afghan informants described a small HIG terrorist cell operating in the Kandahar region of southern Afghanistan. Khan III, 655 F.3d at 21.

Informant A[1] reported that the HIG cell was led by Khan's uncle, Zabit Jalil; that it had already successfully carried out attacks on U.S. and coalition forces near the Kandahar airfield; and that additional attacks were still in their planning phases. See Evidentiary Hr'g, Gov't's Ex. 18 (IIR 6 044 0249 03), at 1-4; Evidentiary Hr'g, Gov't's Ex. 19 (IIR 6 044 0266 03), at 1-4. Specifically, the HIG cell planted explosives on roads frequented by U.S. military vehicles— apparently, "even the little children" in Afghanistan know how to spot them, IIR 6 044 0249 03 at 2—then detonated the explosives remotely in a specific "binary" pattern. Informant A described how the cell would stagger the explosions to maximize American casualties:

> When the Americans are close enough to the kill zone, the first explosion is detonated . . . . The intent of the first explosion is to cause injury and disable the vehicle. This act will force other Americans to investigate the scene and help evacuate the wounded. When a large enough crowd has gathered around the disabled vehicle and wounded personnel, a second, more powerful explosion is detonated . . . . The purpose of the second explosion is to kill the wounded and those who are trying to help them

Id. at 3. Informant A provided U.S. intelligence collectors with the precise radio frequencies used by the HIG cell to detonate the pair of explosions, see id. ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ as well as the specific type of explosive that would be used: "a Chinese or Russian antitank mine approximately 12 inches in diameter" connected to an "electric blasting cap" that is in turn "attached to the radio-controlled electronic detonator," Evidentiary Hr'g, Gov't's Ex. 20 (IIR 6 044 0267 03) at 3. Informant A specifically named petitioner, Shawali Khan, as the

---

[1] The informants' names are classified. To minimize the need for extensive and repetitive redactions, the Court will adopt the naming convention used by the D.C. Circuit in this case: ▮▮▮▮▮▮ will be called "Informant A," and ▮▮▮▮▮▮ will be called "Informant B." The third informant has not been identified by name, and is described in the briefing as an "Afghan government official." The unnamed Afghan government official will be called "Informant C."

SECRET//NOFORN

3

SECRET//NOFORN

group's communicator, reporting that Khan facilitated radio contact amongst the cell's members. IIR 6 044 0266 03, at 3.

A second informant, Informant B, also named Khan as a member of the Kandahar HIG cell, describing Khan as "a go-between and a facilitator." Evidentiary Hr'g, Gov't's Ex. 17 (IIR 6 044 0025 03), at 3. He claimed that Khan "use[d] [his] oil shop to conduct meetings and as a contact point with other members within the cell." Id. Finally, a third informant, Informant C, offered additional specifics about the HIG cell's future plans to carry out attacks: apparently, "mines ha[d] already been emplaced" at two specific locations, but "they ha[d] not been armed with a remote detonation device" yet. Evidentiary Hr'g, Gov't's Ex. 21 (IIR 6 044 0300 03), at 5.

In November of 2002, the U.S. military decided to capture Khan and neutralize the HIG cell. Relying on Informant A to identify Khan's likely whereabouts on a particular date and time, American forces successfully carried out an operation to capture Khan. Evidentiary Hr'g, Gov't's Ex. 1, Decl. of ▇▇▇ at ¶¶ 45-46.[2] After arresting Khan, and searching his oil shop and his home, U.S. forces recovered several pieces of incriminating physical evidence, ▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇ The documents were mostly written in Arabic, and included several notebooks about assassination, surveillance, counterfeiting, and the use and maintenance of automatic weapons, and a book of poems authored by a high-level al-Qaeda leader. See generally Evidentiary Hr'g, Gov't's Ex. 59,

---

[2] ▇▇▇ is a unique alphanumeric identifier used by one of the members of the intelligence team that captured Khan in Kandahar. The other intelligence collectors use similar alphanumeric codes as identifiers. "Khan complains that, because the collectors identify themselves with their alphanumeric codes and ranks rather than their actual names, their statements are not subject to the penalty of perjury and their oaths are meaningless." Khan III, 655 F.3d at 30. But, as explained by the D.C. Circuit, this Court has already "properly rejected this argument, as it finds no support in either case law or the perjury statute." Id. "There is no serious dispute that the alphanumeric codes refer to specific individuals who could be identified for purposes of a perjury prosecution." Id.

SECRET//NOFORN

SECRET//NOFORN

AFGP-2003-000483 (Harmony Database Entry); Evidentiary Hr'g, Gov't's Ex. 60, AFGP-2003-000483 (Original); Evidentiary Hr'g, Gov't's Ex. 62 AFGP-2003-000484 (Translation); Evidentiary Hr'g, Gov't's Ex. 68, AFGP-2003-000540 (Original).

After Khan's capture, Informant B reported that Khan's uncle, Zabit Jalil—a long-time HIG commander and the leader of the Kandahar HIG cell—called a meeting with his HIG colleagues in Pakistan, explaining his desire to replace the entire Kandahar cell, which he felt had been compromised as a result of Khan's capture. See Evidentiary Hr'g, Gov't's Ex. 23 (IIR 6 044 0433 03) at 1-2 (Nov. 22, 2002). And, for the two months following Khan's capture, improvised explosive device attacks in the area stopped completely. Evidentiary Hr'g, Gov't's Ex. 2, Decl. of        ¶ 15(d).

**B.    Khan's narrative: Khan is an innocent shopkeeper.**

Primarily, Khan challenges the reliability of the government's evidence, rather than offering his own, alternative narrative. But, to the extent he offers his own version of events, Khan claims to be an innocent shopkeeper, wrongfully accused by corrupt Afghans who offered lies about him to U.S. forces in return for money. Regarding the physical evidence recovered at his oil shop and his home, Khan has offered some shifting explanations, but primarily claims that he both (1) did not know what the items were (e.g.,

he couldn't read the jihadist training materials because he speaks Pashto, not Arabic), and (2) they did not belong to him (e.g., they were recovered by chance during some looting he did of local businesses or homes abandoned by Arabs fleeing the region).

SECRET//NOFORN

SECRET//NOFORN

## II.    Procedural Background

In Boumediene v. Bush, the United States Supreme Court held that aliens detained as enemy combatants at the United States Naval Base at Guantánamo Bay, Cuba "are entitled to the privilege of habeas corpus to challenge the legality of their detention." 553 U.S. 723, 771 (2008). Khan filed a petition for a writ of habeas corpus two weeks after Boumediene issued, on June 25, 2008. See Khan's Pet. [ECF No. 1]. In his petition, Khan alleged that he was "detained without lawful basis," and asked to be released.

During the early stages of this litigation, Khan "sought—and received—an 'expedited' [Case Management Order], which provided him with an opportunity to file a motion for judgment on the record before full discovery had been conducted." Khan I, 646 F. Supp. 2d at 10; see also Feb. 20, 2009 Case Management Order [ECF No. 81]. Khan took advantage of this opportunity, but the Court denied his motion for judgment on the record, concluding that "although much of respondents' evidence is fatally lacking adequate indicia of reliability, the evidence that remains is sufficient . . . to warrant denial of petitioner's motion." Khan I, 646 F. Supp. 2d at 20; see also id. at 13 (pointing out "two crucial deficiencies" in the intelligence reports submitted by the government in support of Khan's detention: (1) "they contain multiple levels of hearsay" and (2) "all sources are confidential"). The parties thereafter completed discovery. In May 2010, the Court held a three-day evidentiary hearing, at which it heard arguments from counsel, considered the written evidence in the case, and heard testimony from Khan and from Professor Brian Williams, Khan's expert on Afghan warlords.

After considering all of the evidence in the record, the Court denied Khan's habeas petition on September 3, 2010. The Court relied heavily on sworn declarations from members of the intelligence team who had authored intelligence reports tying Khan to the HIG cell, which

SECRET//NOFORN

the Court held "provide[d] the information necessary to assess the sources' reliability under the principles accepted in the intelligence community." Khan v. Obama, 741 F. Supp. 2d 1, 13 (D.D.C. 2010) ("Khan II"). Having rectified the primary concern raised by the Court in its opinion denying Khan's motion for judgment on the record—that is, the reliability of a handful of highly incriminating intelligence documents—the Court focused its decision "on a few key pieces of evidence, which the Court finds reliable and which clearly establish Khan was a 'part of' HIG when he was captured in 2002." Id. at 4.

The D.C. Circuit affirmed in a unanimous opinion, "[f]inding no error" in what it described as this Court's "careful consideration of the evidence." Khan III, 655 F.3d at 21. The D.C. Circuit, just as this Court had done, focused heavily on a handful of "heavily redacted intelligence reports that describe items recovered in searches of [Khan's] properties." Id. at 30. The D.C. Circuit found "[t]hose reports highly incriminating, both because of the nature of the items themselves and because their presence on Khan's properties further corroborates the informants' description of Khan's role in the Kandahar HIG cell." Id. The D.C. Circuit also explicitly affirmed this Court's "finding that HIG was associated with al Qaeda and the Taliban in late 2002." Id. at 33.

Meanwhile, another issue arose during Khan's appeal. In April 2011,

See Ex. A to Pet'r's Mot. for Post-Judgment Relief [Noticed at ECF No. 248]                    Khan argued that

was exculpatory, and filed a motion with the D.C. Circuit to supplement the record on appeal. On the same day that the D.C. Circuit affirmed this Court's denial of Khan's habeas petition, it issued a separate order denying Khan's motion to supplement the record, reasoning that

SECRET//NOFORN

"'[a]ppellate courts do not ordinarily consider evidence not contained in the record developed at trial.'" Khan v. Obama, No. 10-5306 (D.C. Cir. Sept. 6, 2011) (quoting Colbert v. Potter, 417 F.3d 158, 165 (D.C. Cir. 2006)). This denial, however, was explicitly "without prejudice to appellant's renewing the motion in the district court under Federal Rule of Civil Procedure 60(b)." Id. Khan filed a Rule 60(b) motion in this Court shortly thereafter, alleging that ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ was exculpatory, that it would likely have changed the outcome if introduced at Khan's merits hearing, and that government counsel should have produced the document during discovery.

To further complicate things, during briefing on Khan's Rule 60(b) motion, the government filed a "notice that [it is] no longer relying on statements made by Petitioner Shawali Khan during custodial interrogations, or during his Administrative Review Board ('ARB') proceedings, to justify his detention." Gov't's Oct. 12, 2011 Notice of Withdrawal of Reliance on Pet'r's Statements [ECF No. 250]. That same day, the government filed an ex parte submission, "provid[ing] the Court with additional information regarding Respondents' decision to withdraw reliance on statements made by Petitioner Shawali Khan." Gov't's Oct. 12, 2011 Notice of Ex Parte Filing [ECF No. 251].

This filing spurred two more rounds of additional briefing: (1) Khan's supplement to his Rule 60(b) motion, in which he argued that the government's decision to forego reliance on his statements provides another justification for granting post-judgment relief, see Khan's Supp. [Noticed at ECF No. 256]; and (2) Khan's "objection" to the government's decision to confine any explanation of its decision to abandon reliance on his statements to ex parte submissions, see Khan's Opp'n to Ex Parte Filing [Noticed at ECF No. 255]. Khan's "objection" to the ex parte filings is more accurately characterized as a motion to compel disclosure of the government's ex

SECRET//NOFORN

parte submissions. The government treated it as such, filing a formal opposition to Khan's request, along with an additional ex parte declaration offering further support for the government's representations. All of the motions are now fully briefed and ripe for resolution.[3]

## LEGAL STANDARDS

### I. The Government's Detention Authority Under The AUMF

The AUMF authorizes the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001." AUMF, § 2(a). Such "necessary and appropriate force" includes the power to detain combatants subject to such force. See Hamdi v. Rumsfeld, 542 U.S. 507, 519 (2004) (plurality opinion); Al-Bihani v. Obama, 590 F.3d 866, 872 (D.C. Cir. 2010). The scope of this power is broad: the government may detain any individual "engaged in hostilities . . . against the United States," who "purposefully and materially supported hostilities against the United States or its coalition partners," or who "is part of the Taliban, al-Qaida, or associated forces." Al-Bihani, 590 F.3d at 872; see also Hamlily v. Obama, 616 F. Supp. 2d 63, 75 (D.D.C. 2009).

"[T]here are no settled criteria," for determining who is "part of" the Taliban, al-Qaeda, or an associated force. Hamlily, 616 F. Supp. 2d at 75; accord Bensayah v. Obama, 610 F.3d 718, 725 (D.C. Cir. 2010). "That determination must be made on a case-by-case basis by using a functional rather than formal approach and by focusing on the actions of the individual in relation to the organization." Bensayah, 610 F.3d at 725. The Court must consider the totality of the evidence to assess the individual's relationship with the organization. See Naji al Warafi v. Obama, 704 F. Supp. 2d 32, 38 (D.D.C. 2010). But being "part of" the Taliban, al-Qaeda, or an

---

[3] Unfortunately, an administrative oversight led to considerable delay in resolution of the pending motions. The Court sincerely regrets the error. In the future, counsel are encouraged to contact chambers to inquire about the status of a pending motion that has not been addressed in a reasonably timely manner.

SECRET//NOFORN

9

associated force requires "some level of knowledge or intent." Hamlily, 616 F. Supp. 2d at 75;
see also Bensayah, 610 F.3d at 725 ("purely independent conduct of a freelancer is not enough"
to demonstrate an individual was "part of" an organization).

## II.    Evidentiary Issues

Pursuant to the Case Management Order in this action, "[t]he government bears the
burden of proving by a preponderance of the evidence that the petitioner's detention is lawful."
Feb. 20, 2009 Case Management Order, § II.A; accord Al-Adahi v. Obama, 613 F.3d 1102, 1105
(D.C. Cir. 2010); Awad v. Obama, 608 F.3d 1, 10-11 (D.C. Cir. 2010). That standard "'simply
requires the trier of fact to believe that the existence of a fact is more probable than its
nonexistence before he may find in favor of the party who has the burden to persuade the judge
of the fact's existence.'" Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust
for S. Cal., 508 U.S. 602, 622 (1993) (quoting In re Winship, 397 U.S. 358, 371-72 (1970)
(Harlan, J., concurring)).

The evidence on which the government relies to justify Khan's detention is "atypical of
evidence usually presented in federal actions." Abdah v. Obama, 709 F. Supp. 2d 25, 27 (D.D.C.
2010). In particular, the government presents a variety of documents "produced and used by
government intelligence agencies." Id. This evidence includes Intelligence Information Reports
("IIRs"), ███████████████████████████████████ and Form 40s ("FM40s").
IIRs are Department of Defense documents reporting information obtained from human
intelligence sources by the Defense Intelligence Agency and the military's intelligence services.
See Evidentiary Hr'g, Gov't's Ex. 11 (Decl. of ███████████████ at 6. FM40s are
law enforcement documents that record "investigation activity, such as witness interviews," and
"record information relevant to how a crime was committed as well as the logical and factual

SECRET//NOFORN

basis for any deductions about guilt." Id. at 7.



Although many of these documents contain hearsay, hearsay is always admissible in Guantánamo habeas cases. See Al-Bihani, 590 F.3d at 879. The Court must determine, however, "what probative weight to ascribe to whatever indicia of reliability [the hearsay evidence] exhibits." Id. Hence, "'[t]he fact finder must evaluate the raw evidence," resolving whether it is "sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty.'" Parhat v. Gates, 532 F.3d 834, 847 (D.C. Cir. 2008) (quoting Concrete Pipe, 508 U.S. at 622)). The parties therefore must present hearsay evidence "in a form, or with sufficient additional information, that permits the . . . court to assess its reliability." Id. at 849.

Under Parhat, then, the Court first considers whether a particular piece of evidence itself possesses "sufficient hallmarks of reliability," and whether it is corroborated by other reliable evidence. See Khan I, 646 F. Supp. 2d at 13; see also Parhat, 532 F.3d at 849 ("There may well be other forms in which the government can submit information that will permit an appropriate assessment of the information's reliability while protecting the anonymity of a highly sensitive source."); Rugendorf v. United States, 376 U.S. 528, 533 (1964) (affidavit in support of a search warrant containing hearsay from a confidential source may be reliable "so long as there was a

SECRET//NOFORN

substantial basis for crediting the hearsay"); United States v. Laws, 808 F.2d 92, 100-03 (D.C. Cir. 1986) (one informant's hearsay statement can corroborate another informant's hearsay statement). The Court then determines "whether the evidence is in fact sufficiently reliable to be used as a justification for detention." Khan I, 646 F. Supp. 2d at 12. "[I]f courts cannot assess reliability, then the evidence in question is inherently unreliable and may not be relied upon to justify detention." Id.

## III.    Federal Rule of Civil Procedure 60(b)

Rule 60(b) provides that a district court "may relieve a party . . . from a final judgment, order, or proceeding" for one of six specified reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud[,] misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment is satisfied, released or discharged . . . ; or

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b). In addition, Rule 60(d)(3) clarifies that "[t]his rule does not limit a court's power to . . . set aside a judgment for fraud on the court."

Rule 60(b) contains additional temporal obstacles. Specifically, a motion seeking relief under Rules 60(b)(1), (2) or (3) must be filed "no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c)(1). "This one-year time limit is 'ironclad.'" Owens v. District of Columbia, 631 F. Supp. 2d 48, 58 (D.D.C. 2009) (quoting Goland v. CIA, 607 F.2d 339, 372 (D.C. Cir. 1978)).

SECRET//NOFORN

A Rule 60(b) motion filed after one year, under the "catch-all" provision in Rule 60(b)(6), cannot rely on "any other reason that justifies relief," if that "reason" would have been covered by the (time-barred) provisions in Rules 60(b)(1), (2), or (3). "To interpret 60(b)(6) any other way would make the time limitations on motions under 60(b)(1)-(3) meaningless." Baltia Air Lines, Inc. v. Transaction Mgmt., Inc., 98 F.3d 640, 642 (D.C. Cir. 1996); Williamsburg Wax Museum, Inc. v. Historic Figures, Inc., 810 F.2d 243, 249 (D.C. Cir. 1987) ("[I]t is generally accepted that cases clearly falling under Rule 60(b)(1) cannot be brought within the more generous Rule 60(b)(6) in order to escape the former's one year time limitation."); see also Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 (1988) ("Rule 60(b)(6) . . . grants federal courts broad authority to relive a party from a final judgment . . . , provided that the motion . . . is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5).").

As a general matter, "[a] district court considering a motion for relief from judgment under Rule 60(b) must strike a delicate balance between the sanctity of final judgments and the incessant command of a court's conscience that justice be done in light of all the facts." Bain v. MJJ Prods., Inc., 751 F.3d 642, 646 (D.C. Cir. 2014) (emphasis, ellipsis, and internal quotation marks omitted). Accordingly, "relief under Rule 60(b)(6) is appropriate only in 'extraordinary circumstances.'" Kramer v. Gates, 481 F.3d 788, 790 (D.C. Cir. 2007) (quoting Ackermann v. United States, 340 U.S. 193, 199 (1950)). Ultimately, "[t]he trial judge . . . is vested with a large measure of discretion in deciding whether to grant a Rule 60(b) motion." Bain, 751 F.3d at 646 (internal quotation marks omitted).

SECRET//NOFORN

## ANALYSIS

Because Khan challenges a final judgment, he faces a higher bar to obtain relief than he did when the Court first considered his habeas petition. For that reason, the Court could deny his motion for failure to present the sort of "extraordinary circumstances" needed to justify relief under Rule 60(b); for failure to raise some of his arguments in a timely fashion; and for failure to demonstrate that some of his evidence is, in fact, "newly discovered"—even without determining whether it is more likely than not, on the state of the current record, that he is legally detainable under the AUMF. The Court will address all of those defects in Khan's motion, which significantly limit Khan's ability to obtain post-judgment relief. But, because Khan alleges that he is an innocent man who has been unlawfully detained at Guantánamo Bay for over a decade, and because the government's evidence in this case has never been overwhelming, the Court also believes it appropriate to conduct a somewhat more searching inquiry into the current state of the remaining evidence in this case. Nevertheless, after conducting this (essentially, de novo) review of the evidentiary record, the Court is still convinced that it is more likely than not that Khan was "part of" a force associated with the al-Qaeda and the Taliban at the time of his capture. For all these reasons, Khan's motion will be denied.

## I. Post-Judgment Developments Do Not Undermine The Conclusion That It Is More Likely Than Not That Khan Is Lawfully Detained Under The AUMF.[4]

Since entering judgment in this case, several new developments have undermined the government's case for detention. Most importantly, the government abandoned all reliance on Khan's statements, as memorialized by interrogation reports submitted as part of the government's case-in-chief. In addition, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ argues Khan, contradicts some key facts in the government's case, and

---

[4] The Court will not discuss in this opinion any evidence that is unnecessary or irrelevant to disposition of the pending motions.

SECRET//NOFORN

14

thus casts doubt upon the credibility of all of the intelligence collectors, whose declarations have been relied upon heavily in this case (by both this Court and the D.C. Circuit). Ultimately, although these developments have, undoubtedly, made this a closer case, it is still more likely than not that Khan was "part of" an associated force of the Taliban and al-Qaeda at the time of his capture.

A.   The Court need not revisit its prior conclusion that HIG is an "associated force" of the Taliban and al-Qaeda.

There is no allegation that Khan was "part of" the Taliban or al-Qaeda at the time of his capture—only that he was a member of a small HIG cell.[5] So in order to detain him, the government must demonstrate a link between HIG and the Taliban or al-Qaeda, existing at the time of Khan's capture. See Al-Bihani, 590 F.3d at 872 (allowing detention of an individual who "engaged in hostilities . . . against the United States," who "purposefully and materially supported hostilities against the United States or its coalition partners," or who "is part of the Taliban, al-Qaida, or associated forces").

Once again, "[t]he Court does not assess whether HIG is an 'associated force' of al-Qaida or the Taliban on a blank slate." Khan II, 741 F. Supp. 2d at 8. This issue was heavily disputed at the evidentiary hearing in May 2010. The government presented evidence that—despite past disagreements—HIG had "buried the hatchet" with the Taliban and al-Qaeda after September 11, 2001 and the start of Operation Enduring Freedom, and began a cooperative campaign to target U.S. and coalition forces in the region. See, e.g., Evidentiary Hr'g, Gov't's Ex. 13 (Decl. of ████) at 1 ████

---

[5] To be precise, there are some suggestions in the record that Khan was conscripted by the Taliban during the Soviet invasion of Afghanistan, and that he briefly fought with the Taliban against the Northern Alliance in the early 1990s. But the government does not rely on Khan's history with the Taliban to justify his detention, so the Court does not rely on that evidence in ruling on this motion (just as it did not rely on that evidence in its previous denial of Khan's habeas petition). See Khan II, 741 F. Supp. 2d at 9 n.6.

SECRET//NOFORN

<u>id.</u> at 2

On the other hand, Khan offered testimony from Professor Brian Williams, his expert on Afghan warlords, who testified that it was unlikely that HIG would be operating in the Kandahar region of Afghanistan at the relevant time period. See, e.g., Evidentiary Hr'g, Pet'r's Ex. B (Decl. of Brian Williams), at 8 ("The odds are against Hekmatyar having followers in distant Kandahar so soon after his return from exile."); May 13, 2010 Hr'g Tr. 118:10-12 ("I don't want to say that there's no way Hekmatyar could be there, but I will say that it strikes me as strange, improbable, unlikely.").

Considering all of this evidence, the Court concluded that "HIG was an 'associated force' of al-Qaida and the Taliban at the time of Khan's capture in late 2002." <u>Khan II</u>, 741 F. Supp. 2d at 8; <u>accord</u> <u>Khan I</u>, 646 F. Supp. 2d at 19. The Court noted that Professor Williams softened his position under cross-examination, and that he ultimately acknowledged that "after September 11, 2001, HIG reconciled" with the Taliban, leading to a "loose sort of collective mission" between the two organizations. <u>Khan II</u>, 741 F. Supp. 2d at 8 & 8 n.4. When Khan raised this issue on appeal, the D.C. Circuit agreed that Professor Williams' testimony "did not truly rebut the government's position," and affirmed this Court's conclusion that "HIG was associated with al Qaeda and the Taliban in late 2002." <u>Khan III</u>, 655 F.3d at 33.

In his Rule 60(b) motion, Khan does not explicitly challenge the conclusion that HIG is properly considered an "associated force" of the Taliban and al-Qaeda. None of the "new" evidence he puts forth relates to HIG's relationship with the Taliban or al-Qaeda. And this Court did not rely on Khan's statements, now withdrawn from the government's case, in any significant way in issuing its previous decisions on this issue. Nor did the D.C. Circuit. Accordingly, the

SECRET//NOFORN

conclusion that HIG is an "associated force" of the Taliban and al-Qaeda stands unchallenged. Hence, the government need only show that it is more likely than not that Khan was "part of" HIG at the time of his capture in order to lawfully detain him. See Al-Bihani, 590 F.3d at 872.

**B.** **Even without Khan's statements, sufficient evidence supports the conclusion that Khan was "part of" HIG at the time of his capture.**

The most significant development since the entry of judgment in this Court, and the D.C. Circuit's affirmance of that judgment, is the government's decision to abandon any reliance on Khan's statements (that is, with the exception of Khan's testimony at the merits hearing). Those statements were relied upon by the government for many years, and were specifically advanced by the government at the merits hearing as part of the case for Khan's detention. But, as discussed below, although Khan's statements generally supported the conclusion that Khan was detainable under the AUMF, those (mostly incriminating) statements were not central to the analysis in this Court or in the D.C. Circuit. Even without them, other evidence in the record supports the conclusion that it is more likely than not that Khan was an HIG operative—not an innocent shopkeeper.

1. Intelligence reports describe highly incriminating physical evidence recovered at Khan's properties.

"As framed over the course of these proceedings, this case now centers on a few key pieces of evidence" that are highly incriminating. Khan II, 741 F. Supp. 2d at 4. Chief among them: intelligence reports describing physical evidence recovered at Khan's properties, which is not just incriminating on its own, but also corroborates other incriminating reports from Afghan informants.

SECRET//NOFORN

Needless to say, the odds of this

exact ▮▮▮▮▮▮▮ appearing by chance in two places at once—first, in a description from

an informant about Khan's involvement in an HIG cell; second, on ▮▮▮▮ found at a search

incident to Khan's arrest—approach zero. And although there may be, theoretically, alternative

possible explanations—for example, that Khan was set up as a part of some elaborate

conspiracy[6]—it is <u>much</u> more likely than not that Khan was in possession ▮▮▮▮▮▮▮▮▮

▮▮▮▮ for the reason offered by the government and its informants: Khan was part of an HIG cell,

planning attacks on U.S. and coalition forces by means of a radio-controlled, binary explosive

---

[6] The Court will discuss (and reject) this theory below. See <u>infra</u>, Section I.B.4.

SECRET//NOFORN

device. As the Court explained once before, "[t]he government's narrative . . . corroborates itself—that ▇▇▇▇▇▇▇▇▇▇▇▇ recovered from Khan's properties renders reliable [Informant A's] report ▇▇▇▇▇▇▇▇ and vice versa." Khan II, 741 F. Supp. 2d at 18.

Even setting aside ▇▇▇▇▇▇▇ other physical evidence recovered by U.S. forces is also incriminating. For example, finding ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ on Khan's property is, once again, highly supportive of the conclusion that Khan was a member of an HIG cell, specializing in explosive attacks on U.S. and coalition personnel.

None of this evidence depends on Khan's statements. To be sure, the Court did cite a December 17, 2002 interrogation report—in which Khan admitted ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ (he offered somewhat implausible explanations ▇▇▇▇)— as additional corroboration of the government's arguments tying Khan to this evidence. See Khan II, 741 F. Supp. 2d at 17 ("The Court concludes, however, that it need not rely on the four corners of the interrogation summary to determine its reliability—the other evidence in the record corroborates Khan's admission ▇▇▇▇▇▇▇▇▇▇ But the evidence itself is still highly incriminating, and is still reliable enough for current purposes, see infra Section I.B.3, even without Khan's statements.

> 2. Intelligence documents detail incriminating reports from several informants.

Several informants pointed to Khan as a key member of an HIG cell that targeted U.S. and coalition forces in and around Kandahar. Informant A "identified two members of the cell— Shawali Khan and Noor Agha—and indicated that Khan served as a communicator between Noor Agha, the cell's facilitator, and other cell members." Khan II, 741 F. Supp. 2d at 9.

SECRET//NOFORN

Informant A also told U.S. intelligence collectors that the HIG cell was "planning an attack against Americans through the use of radio-controlled binary explosive devices." IIR 6 044 0249 03 at 1. He also brought the intelligence collectors one of the binary detonators, id. at 4—apparently a highly unusual gesture—suggesting Informant A's reliability and trustworthiness, see Decl. of ▮▮▮▮ ¶ 43 ("It was extremely unusual for a source to provide such evidence to back up his statements. This type of action is a sign of above average reliability.").

Informant B offered similar incriminating information about Khan.[7] This source related that "Shah ((Wali)) [Khan] is a go-between and a facilitator within a Hezb-i-Islami, Gulbuddin operations cell," who "delivered a radio-controlled binary detonation device and two blasting caps to an operative working within his organization." IIR 6 044 0025 03, at 3. Finally, Informant C offered corroborative information about the HIG cell generally, its operations in Kandahar, and its plans to attack U.S. and coalition forces. See, e.g., IIR 6 044 0300 03, at 6-7 ("The information and methods of operation in this report confirms, in part, the information reported in IIR 6044 0249 03.").

None of this evidence relies on Khan's statements, in any way.

3. The key evidence is reliable, even without Khan's statements.

At the heart of this case, and all its iterations before this Court and the D.C. Circuit, is the question of the reliability of the incriminating intelligence reports and informant tips discussed above. It is upon this evidence that the government's case for detention primarily rests. In Khan I, this Court held that, "standing alone," the incriminating intelligence reports bore "none of the hallmarks of reliability that the intelligence community itself looks to in assessing the

---

[7] Apparently, Informant B may have been relying on Informant A as a sub-source (at least in part). But, as explained by the D.C. Circuit, "[t]he relevant question is not the number of independent sources but rather the reliability of their evidence, which the government has sufficiently established for all the reasons discussed in this subpart." Khan III, 655 F.3d at 29 n.7.

SECRET//NOFORN

20

SECRET//NOFORN

reliability of raw, human intelligence." Khan I, 646 F. Supp. 2d at 14. But after full discovery, in Khan II the Court held that detailed, sworn declarations from members of the intelligence team that prepared the intelligence reports assuaged the Court's concerns. See Khan II, 741 F. Supp. 2d at 13 ("These declarations provide the information necessary to assess the sources' reliability under the principles accepted in the intelligence community.").

This conclusion was based on the detailed and persuasive accounts from the intelligence team as to the procedures and methods they used to ensure they were working with reliable information. For example, with respect to Informant A, the intelligence team knew that he had direct access to the information he was providing, because he was a member of the HIG cell. See Decl. of         at ¶ 37. But, for that very same reason, the intelligence collectors initially were "wary because [they] would not easily trust a man that had already attacked U.S. forces and planned to do so again." Id. ¶ 38. As their meetings continued, the intelligence collectors "became more and more confident that [Informant A] was providing extremely reliable information. He spoke to [the collectors] voluntarily and in a spontaneous and detailed way, and to the extent [the collectors] were able to make a determination, the intelligence [Informant A] provided was accurate." Id.; see also id. ¶ 41 ("Our Team was able to independently verify much of the information he provided."). The intelligence team ultimately "concluded that [Informant A's] information was sufficiently reliable to plan the operation for Khan's capture based on it." Khan II, 741 F. Supp. 2d at 13 (citing Decl. of         at ¶ 45). This Court remains of the view that "[i]ntelligence collectors in the field, facing dangerous life-or-death situations, would not . . . act on the basis of information they felt was unreliable," id.—and that is strong support for the reliability of the key evidence in this case.

SECRET//NOFORN

The D.C. Circuit agreed, affirming this Court's conclusion that the key evidence against Khan was sufficiently reliable, pointing to much of the same information. See Khan III, 655 F.3d at 30 ("In short, the reports . . . , supplemented by the Army intelligence collectors' declarations, are a far cry from the 'bare assertions' deemed unreliable in Parhat, because they possess both endogenous and exogenous indicia of reliability. We find no error in the district court's determination that they were reliable.") (internal citation omitted).

The question, then, is whether the absence of Khan's statements requires a reassessment of that conclusion. It does not. Khan's statements had little to do with this Court's or the D.C. Circuit's assessments that the key evidence in this case survived scrutiny under the Parhat standard. Indeed, Khan's motion attacks the reliability of this evidence on other grounds—for example, newly discovered factual inconsistencies that allegedly bear on the intelligence collectors' credibility, see infra, Sections I.C, I.D—but does not challenge the legal conclusion that there are sufficient indicia of reliability on the face of these reports to satisfy the Parhat standard. To be sure, many of Khan's statements did offer additional corroboration of the government's case. But those statements were only supportive of the conclusion that the reports were reliable—they were not necessary (or even significant) to that conclusion.[8] Hence, the Court reaffirms its prior conclusion, affirmed by the D.C. Circuit, that "the key pieces of evidence deployed by the government are reliable." Khan II, 741 F. Supp. 2d at 17; see also Khan III, 655 F.3d at 30 ("We find no error in the district court's determination that [the intelligence reports] were reliable.").

---

[8] For example � ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Khan's admissions ▇▇▇▇▇▇▇▇ corroborated the other evidence in the record on these topics. But those admissions were not necessary to the Court's conclusion that this evidence was reliable. And the D.C. Circuit only cited Khan's statements as "further support" for the conclusion it had already drawn: that the reports were "nothing like the intelligence reports" deemed unreliable in Parhat. See Khan III, 655 F.3d at 27-28.

SECRET//NOFORN

4.   No evidence in the record supports Khan's theory of the case.

Khan's primary arguments are directed to challenging the reliability of the evidence upon which the government relies. But, ultimately, he does offer his own narrative: that he was an innocent shopkeeper, set up by corrupt Afghans (possibly due to his uncle's ties to HIG), seeking bounty payments from the U.S. military. Previously, the Court explained that it "does not find credible Khan's insistence that he was merely managing a small petrol shop at the time of his capture." Khan II, 741 F. Supp. 2d at 18. And on the specific issue of cash bounties, sworn testimony from the intelligence collectors strongly contradicts Khan's theory. See, e.g., Decl. of ▬▬▬, at ¶ 47 ("I do not recall providing any compensation to [Informant A]"); id. ¶ 63 ("I am not aware of any information that suggests a bounty was paid in regards to Shawali Khan's capture."); Decl. of ▬▬▬ at ¶ 16 ("[Informant A] would not accept compensation from me in exchange for his assistance. He was paid by HIG so he was not desperate for money and it was my assessment that he provided information to my Team, in part, to make amends for the attack that resulted in the death of some of his tribesmen."); id. ¶ 51 ("I am not aware of any information that suggests a bounty was paid in regards to Shawali Khan's capture or information that led to his capture. I am not aware of any quid pro quo arrangement with any source for information about Shawali Khan or the activities of the terrorist cell of which he was a part."); Evidentiary Hr'g, Gov't's Ex. 3, Decl. of ▬▬▬ at ¶ 21 (making similar representations). Indeed, at the evidentiary hearing, Khan's counsel did not dispute the Court's suggestion that "there's nothing that would directly support the theory that bounties were paid relevant to this case." May 17, 2010 Hr'g Tr. 50:24-25.

In response, Khan offers nothing. In other words, the record still contains no credible evidence to support the theory that Khan was set up as a part of some elaborate conspiracy that

SECRET//NOFORN

duped the U.S. military. And, in addition to all of the evidence supporting the government's narrative that Khan was part of an HIG cell, and the declarations from intelligence collectors refuting Khan's bounty theory, some evidence in the record affirmatively undermines Khan's conspiracy theory. Specifically, Khan ignores the inconvenient fact that any conspiracy targeting him would have had to continue, somewhat implausibly, after his capture. See, e.g., IIR 6 044 0433 03, at 1-2 (Informant B describing HIG meeting, attended by Khan's uncle and senior HIG operatives from Pakistan, in which HIG leaders discussed how best to proceed in Khan's absence, and lamented that "the arrest of Shah Wali [Khan] will diminish the effectiveness of the HIG cell in Kandahar for at least several weeks"). If corrupt Afghans telling lies led to Khan's arrest by U.S. forces, it is difficult to understand why, after the fact, informants would be providing completely new false reports to intelligence collectors about the aftermath of Khan's arrest. Khan was already gone, so why risk more lies to U.S. forces—surely a dangerous business—when the goal of getting rid of Khan had already been accomplished? Khan has offered no plausible innocent explanation. In any case, the relevant question is not whether the government's evidence is completely airtight, but whether it satisfies the preponderance of the evidence standard. Here, it does. Khan's version of events is not supported by the record, and hence does not undermine the government's assertion that Khan is more likely than not detainable under the AUMF.

5.  Khan's incriminating statements strengthened the government's case, but were not a significant factor in this Court's or the D.C. Circuit's analysis.

Finally, the Court turns directly to the content of Khan's incriminating statements, made during various interrogations after his capture.

Khan also made

SECRET//NOFORN

some exculpatory statements. See, e.g., Evidentiary Hr'g, Gov't's Ex. 35, ISN 899 FM40 (Feb. 21, 2003), at 1 (Khan reported his belief that "he was arrested because they couldn't arrest his uncle"). Most of Khan's statements, however, had little or no bearing on the ultimate decision in this case—either before this Court or the D.C. Circuit.

In Khan II, this Court cited some of Khan's statements to support its ultimate conclusion. Specifically, the Court pointed to "Khan's admission ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒ 741 F. Supp. 2d at 17, but primarily as corroboration of the other consistent evidence in the record from informants. Hence, although withdrawing reliance on Khan's statements does eliminate some additional corroboration of the government's case, that additional corroboration was never necessary to persuade the fact-finder that it is "more likely than not" that Khan is who the government says he is. And that is enough.

Similarly, the D.C. Circuit opinion made no significant references to Khan's statements; it only cited in passing Khan's admissions that he possessed some of the items recovered in the search of his home and his properties, as well as his HIG affiliation during the anti-Soviet jihad. See Khan III, 655 F.3d at 28. And the D.C. Circuit did so primarily as "further support," id., for the conclusion it had already reached (that is, that the incriminating reports from informants were reliable)—a telling turn of phrase that confirms what a careful reader can see from the face of the opinion: Khan's statements were simply not significant to the D.C. Circuit's analysis.

\*       \*       \*

The government's belated decision to forego all reliance on Khan's statements—which statements previously had been affirmatively advanced by the government in its written briefs and at the evidentiary hearing—is certainly the most significant post-judgment development in this case. And its timing is quite unfortunate. Nevertheless, after a de novo consideration of the

...

remaining evidence in the record, the Court is confident that the absence of Khan's statements does not undermine its previous conclusion, affirmed by the D.C. Circuit, that it is more likely than not that Khan is lawfully detained under the AUMF.

C. **The two-day discrepancy in Khan's capture date does not significantly undermine the credibility of the intelligence collectors.**

The next post-judgment development to be considered is what Khan characterizes as a significant error, which has recently come to light, about the date of his capture. Specifically, Khan relies on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to attack the credibility of the intelligence collectors, and impeach the validity of their declarations— declarations which, as discussed above, were critical to satisfying the Court that the intelligence reports were reliable and, thus, that sufficient reliable evidence supports Khan's detention. To make this argument, Khan offers the following chain of reasoning: (1) some of the intelligence reports relied upon by the Court list November 13, 2002 as Khan's date of capture; (2) ▮▮▮▮▮

▮▮▮▮▮ lists November 15, 2002 as Khan's date of capture; (3) ▮▮▮▮▮▮▮▮▮▮▮ is the government's "definitive" view on Khan's date of capture; therefore (4) the intelligence reports are wrong about Khan's date of capture; and hence (5) the intelligence reports and accompanying declarations are not reliable. This argument suffers from several logical and factual flaws.

At the outset, this is not a "new" argument at all. At the May 2010 evidentiary hearing, counsel—for both sides—pointed to several pieces of evidence suggesting that Khan's capture date was November 15, rather than November 13 (or, at least suggesting that the date was uncertain). See, e.g., Evidentiary Hr'g, Gov't's Ex. 53, ISN 899 Interrogator Notes (December 17, 2002) (listing a capture date of November 15, 2002); Evidentiary Hr'g, Gov't's Ex. 51, ISN 899 DAB (undated) ("On 15 November 2002, US Special Forces (USSF) arrested detainee under charges of significant links to his uncle Zabit Jalil, a HIG Commander."). Indeed, Khan's

counsel read into the record the same date-of-capture information that he now claims is newly discovered. See May 13, 2010 Hr'g Tr. at 141:15-20 ("It also says circumstances of capture 'On 15 November'—I'm reading from the bottom of [Government Exhibit 51] . . . 'On 15 November 2002, U.S forces arrested detainee under charges of significant links to his uncle's Zabit Jalil, HIG Commander.'"); see also id. at 141:12-15 ("[I]t says DOC, date of capture—I assume that means date of capture—15 November 2002, which apparently is two days after he was approached by—he was first approached."). The Court was largely unconcerned by this discrepancy then, and it is largely unconcerned with this discrepancy now. The same was true before the D.C. Circuit. See Khan III, 655 F.3d at 28 n.6 (acknowledging in a footnote that "there is some inconsistency in the record as to the precise date of Khan's capture," but rejecting Khan's argument that this undermined the government's case).

Most significantly, even if the intelligence collectors made a two-day mistake about the date of Khan's capture, it does not at all follow that everything else—or anything else—in their reports is either incorrect or fabricated. All it means is that someone may have gotten a date wrong. To be sure, one mistake makes it more likely that the reports contain other mistakes. But even so, Khan does not persuasively explain what other mistakes might be lurking, or the basis for this belief. Instead, he primarily makes a blanket attack on the reliability of all the information in all of the intelligence reports. See Pet'r's Mot. for Post-Judgment Relief, at 8 ("It now appears ▮▮▮▮▮▮▮▮▮▮▮▮ that the story told by the anonymous declarants, about a special forces raid and take down of Khan's operation, is false."). The Court is simply not persuaded that this is an appropriate response to a possible two-day discrepancy in Khan's capture date.[9]

---

[9] The closest Khan comes to a specific theory of why this error could have significance is his claim that the two-day discrepancy supports his theory that he was first captured by Afghans, rather than by Americans. But that

Faced with an analogous situation in this very case, the Court came to a similar conclusion. At the evidentiary hearing, Khan's counsel successfully persuaded the Court "that the intelligence collectors' declarations inaccurately detail the timeline of when [Informant B] introduced the collectors to [Informant A]." Khan II, 741 F. Supp. 2d at 16. Specifically, Khan's counsel, astutely, pointed out an inconsistency in the dates reported in various intelligence reports about the timing of meetings with the informants, and used this inconsistency to argue that, "[b]ecause of their faulty recollections on this point, . . . the Court should not rely on the intelligence collectors' declarations to bolster the intelligence reports at all." Id. The Court rejected this argument; it was "not persuaded . . . that these inaccuracies require the Court to disregard the declarations." Id.; see also id. ("[T]he Court cannot conclude that all of the information provided by the intelligence collectors is incorrect merely because they misremember when [Informant B] introduced [Informant A] to them."). So too here: "[a]lthough the mistaken recollections do give the Court some pause," id., the two-day discrepancy in Khan's capture date is not nearly as significant as Khan makes it out to be.

Finally, Khan appears to be incorrect when he argues that ⬛⬛⬛⬛ is the "authoritative" U.S. government assessment of Khan's capture date. He offers no support for this assertion. And the government refutes it persuasively, by explaining "that a detainee assessment brief is a derivative document that summarizes information from other sources." Gov't's Opp'n to Khan's Mot. for Post-Judgment Relief ("Gov't's Opp'n") [Noticed at ECF No. 253], at 15 n.5. And, in this instance, ⬛⬛⬛⬛

⬛⬛⬛⬛

theory is strongly contradicted by ample evidence in the record, and was persuasively discussed and rejected by the D.C. Circuit. See Khan III, 655 F.3d at 28 n.6 ("Other government documents . . . state that he was captured by U.S. forces . . . , and the U.S. Army intelligence collectors aver that they personally participated in his capture.") (citing Decl. of ⬛⬛ , ¶¶ 57-61; Decl. of ⬛⬛ ¶¶ 43-47). Khan's theory is not supported by the record and, even with the date discrepancy, ⬛⬛ does not change that.

▆▆▆▆ Thus, in the end, it is not at all clear that any "authoritative" capture date exists, and Khan offers no reason to trust the November 15th date ▆▆▆▆▆▆▆ over the November 13th date included in many other documents in the record.

For all these reasons, the two-day discrepancy in Khan's capture date cannot bear the weight he ascribes to it. Although the Court would surely feel more comfortable if the intelligence collectors made no mistakes in their reports, this one, if a mistake at all, is not enough to sap the reports of their reliability. Hence, the Court finds that the intelligence reports, supported by sworn declarations from the intelligence team that drafted them, remain sufficiently reliable.

**D.** **Evidence that Khan did not understand Arabic does not significantly undermine the Court's conclusions.**

▆▆▆▆▆▆ second piece of exculpatory information: that Khan likely was not able to read or write Arabic. Khan argues that this bolsters his credibility, relying on ▆▆▆▆▆

▆▆▆▆▆▆▆▆▆

▆▆▆▆▆ Khan has insisted that these materials—-which included several notebooks about ▆▆▆▆▆▆▆ the use and maintenance of automatic weapons, and a book of poems authored by a high-level al-Qaeda leader—did not belong to him, and that he had collected them after looting the homes and businesses of Arabs fleeing Afghanistan.

Khan is correct that this information is exculpatory: it bolsters the credibility of Khan's assertion that he had these materials for reasons other than terrorist affiliations. But, ultimately,

SECRET//NOFORN

it does not tip the overall evidentiary balance in Khan's favor, for two reasons. The first is that the Court has never placed any significant reliance on these materials. Indeed, they were hardly mentioned in Khan II or in the D.C. Circuit opinion affirming it. This evidence was simply not necessary to the ultimate conclusion that it was more likely than not that Khan was a "part of" HIG, in light of the other, stronger evidence in the record, ███████████████████████████ ███████████████████████ and the several (and consistent) incriminating reports from government informants.

The second reason is that, even if Khan could not read Arabic, finding jihadist training materials in his home is still generally supportive—albeit just slightly—of the government's narrative. To be sure, this evidence is less compelling—perhaps much less compelling—if Khan could not understand the text in the documents. But that does not drain them of all evidentiary significance—it remains possible (indeed, perhaps even likely, given the other evidence in the record) that Khan had these materials because of his terrorist connections. So even though they are less probative now than when the government thought that Khan could read Arabic, that does not mean this evidence is valueless.

In sum, these materials have never played a significant role in the Court's analysis of the overall evidentiary picture in this case. And any marginal value of this evidence to the government's case has now been undermined by the new information about Khan's language skills. But the overall picture remains the same: it is more likely than not that Khan was "part of" HIG at the time of his capture. ███████████████████████ Khan's lack of Arabic proficiency does not undermine that conclusion.

SECRET//NOFORN

## II. Khan Is Not Entitled To Relief Under Rule 60(b).

The preceding discussion has analyzed the remaining evidence in this case to consider whether, on the state of the current record, it is more likely than not that Khan was "part of" HIG at the time of his capture and, thus, lawfully detainable under the AUMF. The Court answered that question in the affirmative. But, in truth, the Court need not consider all of this information on a clean slate, because a final judgment has already been entered in this case. For that reason, any relief Khan might be entitled to must fit through the narrow window offered by Federal Rule of Civil Procedure 60(b). Khan, however, cannot make the high showing required to obtain post-judgment relief. Hence, even if a de novo review of the current state of the evidentiary record had given the Court pause about the propriety of the government's initial decision to detain him, Khan would still not be entitled to relief.

### A. Khan's motion is partially time-barred.

A motion seeking relief under Rules 60(b)(1), (2) or (3) must be filed "no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c)(1). "This one-year time limit is 'ironclad.'" Owens, 631 F. Supp. 2d at 58 (quoting Goland, 607 F.2d at 372). Khan's motion was filed more than one year after the entry of judgment in this case. Hence, as Khan concedes, he cannot obtain relief under Rule 60(b)(1), (2), or (3). See Pet'r's Reply in Supp. of Mot. for Post-Judgment Relief ("Pet'r's Reply") [Noticed at ECF No. 254], at 2 ("The government correctly observes that Khan's Rule 60 motion was filed outside of the one-year time limitation imposed under Rule 60(b)(1-3)."). In other words, Khan cannot rely on "mistake," "newly discovered evidence," or "fraud[,] misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(1)-(3). True, Rule 60(b)(6) allows for relief, even after one year, for "any other reason that justifies relief"—but only where that

"reason" would not have been covered by one of the time-barred provisions. As the D.C. Circuit has explained, "[t]o interpret 60(b)(6) any other way would make the time limitations on motions under 60(b)(1)-(3) meaningless." Baltia, 98 F.3d at 642.

Therefore, by the plain terms of Rule 60, Khan may not rely on "newly discovered evidence," or "fraud[,] misrepresentation, or misconduct by an opposing party"—relief under those provisions of Rule 60(b) is time-barred. Unfortunately for Khan, some of his arguments clearly fall under these provisions. For example, Khan describes ███████████ as "new authoritative information," Pet'r's Reply at 5, bolstering Khan's credibility and undermining the government's case regarding Khan's capture date, and his knowledge of Arabic.[10] Similarly, Khan accuses the government of "misrepresentation[s]" on these same issues. Hence, even if Khan's arguments about ███████████ had been persuasive—and the Court concludes they are not—they are time-barred.

**B.** **None of the post-judgment developments qualify as "extraordinary circumstances" justifying relief under Rule 60(b)(6).**

As discussed at length above, none of the post-judgment developments, even if considered de novo and in combination, are sufficient to dissuade the Court of its previous conclusion that it is more likely than not that Khan is lawfully detainable under the AUMF. Moreover, if the current state of the record had been more evenly balanced, Rule 60(b)(6) requires a higher showing. Specifically, a district court should only disturb a final judgment under Rule 60(b)(6) under "extraordinary circumstances," Kramer, 481 F.3d at 790, in light of the important obligation to respect the "sanctity of final judgments." In re Hope 7 Monroe Street Ltd. P'ship, 743 F.3d 867, 873 (D.C. Cir. 2014). Khan has not demonstrated "extraordinary circumstances," so he is entitled to no relief under Rule 60(b)(6).

---

[10] In any event, as discussed below, infra Section II.C, it is not at all clear that this evidence is actually "newly discovered."

SECRET//NOFORN

C. **Apparently,** ███████████ **was produced to Khan's counsel before the evidentiary hearing.** .

In Khan's motion for post-judgment relief, he asserts that ████████████████████

████████████████████████████████████ just weeks before oral argument at the D.C. Circuit. Similarly, he claims that the government's withholding of this document constituted a misrepresentation—indeed, that it rose to the level of "fraud on the Court." Pet'r's Reply at 2; see also infra Section III. The preceding analysis considered this evidence primarily relying on this assumption (ultimately finding that, even if withheld, the information in ████████████ would not have made a difference).

The truth here, it seems, is not on Khan's side. According to the government, "the document that [Khan] now alleges is 'newly discovered' was produced to his counsel at the Secure Facility on March 10, 2010, months in advance of the May 2010 merits hearing." Gov't's Opp'n at 1. To support this claim, the government includes an index, detailing the government's productions to Khan's counsel in this case. See Attach. 2 to Gov't's Opp'n, Production Index for Shawali Khan (ISN 899) (March 10, 2010) (listing ████████████████████

████████████████ as a document produced to Khan's counsel).

In response, Khan concedes the issue by failing to adequately dispute the government's representations, arguing only that "neither attorney for Khan . . . recalls seeing such a disclosure." Pet'r's Reply at 1. Of course, it does not matter much whether Khan's counsel remembers seeing this document—what matters is whether the government produced it. Hence, Khan's reliance on ████████████████ is further weakened, as any information therein could have been presented to the Court at the evidentiary hearing in May 2010. The apparent availability of this document to Khan's counsel at the time of the hearing is virtually dispositive: Rule 60 does not provide a second-chance opportunity for a losing party to make new arguments

~~SECRET//NOFORN~~

they could have made the first time around. See, e.g., McManus v. District of Columbia, 545 F. Supp. 2d 129, 134 (D.D.C. 2008) ("Rule 60(b) may not be relied upon to rescue Plaintiffs from their poor strategic choices.").[11]

### III.  Khan Cannot Demonstrate Fraud On The Court,

Khan correctly points out that the strict limitations of Rule 60(b) "do[] not limit a court's power to . . . set aside a judgment for fraud on the court," Fed. R. Civ. P. 60(d)(3). As the D.C. Circuit has explained, "[f]raud on the court is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury." Baltia, 98 F.3d at 642 (ellipsis and internal quotation marks omitted). Instead, "[f]raud upon the court refers only to very unusual cases involving far more than an injury to a single litigant." Id. at 642-43 (internal quotation marks omitted); see also Bowie v. Maddox, 677 F. Supp. 2d 276, 278 n.2 (D.D.C. 2010) (explaining that "[f]raud on the court does not encompass ordinary fraud" or "unintentional misrepresentations," and that "the fraud must be egregious").

The only possible basis for a finding of "fraud" here would be related to the alleged withholding of ▓▓▓▓▓▓▓▓▓▓ during discovery. But as discussed above, it seems that the government likely did produce the document in early 2010. See Attach. 2 to Gov't's Opp'n. And even if the document was improperly withheld, if anything, this might qualify as "fraud between the parties," and would be no more than a possible "injury to a single litigant." Baltia, 98 F.3d at 643. In addition, Khan makes no allegation that this document was withheld intentionally.

---

[11] For this reason, there is no "new" information in the ▓▓▓▓▓▓▓ question the government's satisfaction of its discovery obligations ▓

So, once again, Khan's arguments about purported inadequacies in the discovery process must be rejected. Khan raised many similar concerns before the evidentiary hearing, and all of these issues were resolved in the government's favor, after Khan's counsel conceded that he was satisfied with the government's discovery efforts. Khan II, 741 F. Supp. 2d at 7 ("[T]he Court has no basis on which to conclude that the government did not follow the Court's discovery orders."); see also id. ("Based on the government's representations, Khan did not ask for further discovery."). The Court sees no reason to revisit the issue again now.

SECRET//NOFORN

Hence, even accepting Khan's (largely unsupported) allegations of impropriety, there was no fraud on the court here, and Khan's motion under Rule 60(d)(3) will be denied.

## IV.   Khan's Motion To Compel Will Be Denied.

The government's explanation for its decision to drop reliance on Khan's statements was almost entirely confined to ex parte, in camera submissions. Khan filed a formal "objection" to this approach, in what is effectively a motion to compel disclosure of the government's ex parte filings. The Court will deny Khan's motion to compel, for two reasons: (1) the government's explanation is not "exculpatory evidence" that must be disclosed to Khan's counsel under the terms of the Case Management Order governing this case, and (2) the Court finds persuasive the national security concerns described in the government's ex parte filings.

Under the Case Management Order governing this case, "[t]he government shall disclose to the petitioner all reasonably available evidence in its possession that tends materially to undermine the information presented to support the government's justification for detaining the petitioner." Case Management Order § I.D.1. The government's explanation of its decision to drop reliance on Khan's statements (and any documents associated with that explanation) does not meet this definition. The reason is simple: when the government decided to abandon any reliance on Khan's statements, that information no longer "tends materially to undermine the information presented to support the government's justification for detaining the petitioner." Id. In other words, the government no longer "present[]s" anything related to Khan's statements "to support the government's" case. Hence, even if the material Khan is seeking could once have been described as "exculpatory evidence" under the terms of the Case Management Order, or was otherwise responsive to the government's discovery obligations, it no longer fits this description, now that Khan's statements are no longer part of the government's case against him.

SECRET//NOFORN

35

SECRET//NOFORN

Moreover, the Court's independent review of the ex parte materials confirms that, at this time, they do not constitute evidence "that tends materially to undermine the information presented to support the government's justification for detaining the petitioner." Id.

To be sure, the timing is regrettable—it surely would have been preferable for the government to get its ducks in a row before the evidentiary hearing in which it advanced Khan's statements as support for his detention. But, in any event, as of this date, under the Case Management Order governing these proceedings, Khan is not entitled to anything more. And these documents, importantly, are of interest to these proceedings primarily because of their potential relevance to Khan's statements—statements which, as discussed above at length, see supra Section II, are ultimately of little significance to the question of the legality of his detention, in light of other evidence in the record. So any prejudice to Khan here is minimal.

The Court's decision is also animated by the fact that, having carefully considered the government's ex parte explanation for its decision to drop reliance on Khan's statements, the government has presented legitimate national security justifications for limiting further dissemination of this information. Although ex parte submissions are disfavored—even in the somewhat unique context presented by these Guantánamo Bay habeas corpus proceedings—the Court is not inclined to require unnecessary dissemination to anyone, including to petitioner's counsel, of information that the government persuasively argues could cause exceptionally grave damage to the national security interests of the United States of America. The D.C. Circuit has consistently instructed district courts to be mindful of such considerations, requiring that a district court determine that classified information is "both relevant and material," and that it is "necessary to facilitate" meaningful habeas review, before ordering disclosure to petitioner's counsel over the government's objection. See, e.g., Al-Odah v. United States, 559 F.3d 539,

SECRET//NOFORN

544-45 (D.C. Cir. 2009); see also id. ("This court has held that classified information is not discoverable on a mere showing of theoretical relevance in the face of the government's classified information privilege.") (internal quotation marks omitted). As discussed above, this disclosure is now unnecessary: because the government no longer relies on Khan's statements, any explanation for that decision is largely irrelevant to this case.[12] Khan's motion to compel will be denied.

## CONCLUSION

This Court and the D.C. Circuit have already held that Khan is lawfully detained under the AUMF, because it is more likely than not he was "part of" an associated force of the Taliban and al-Qaeda at the time of his capture in mid-November 2002.[13] None of the post-judgment developments raised by Khan are sufficient to undermine that conclusion—let alone to justify the extraordinary relief of reopening a final judgment. Hence, upon consideration of the parties' submissions, the extensive evidentiary record in this case, applicable law, and the entire record herein, Khan's motion for post-judgment relief will be denied. A separate Order has issued on this date.[14]

---

[12] Khan also resorts to an ad hominem attack on government counsel, claiming that one of the Department of Justice attorneys assigned to this case committed a discovery violation in another Guantánamo Bay habeas case in this district, Ali v. Obama, Case No. 10-1020 (RJL). The Court need not say much about this argument, except that any discovery problems in another case have no bearing on this one, and that Khan's argument is, ultimately, unpersuasive, and based upon exaggerations about the record in Ali.

[13] At a recent status conference, Khan's counsel argued that the government will be obligated to release Khan once U.S. "hostilities" in Afghanistan come to a close. As the Court explained at the status conference, and as another judge in this district recently held, whatever significance the end of active hostilities in Afghanistan may have for detainees like Khan, that issue can be addressed if and when hostilities cease. As of this date, active hostilities remain ongoing, so any further discussion of this issue would be premature. See al Odah v. United States, 2014 WL 3809772, at *7 (D.D.C. Aug. 3, 2014) ("While the President expressed ambitions of having less than 10,000 troops in Afghanistan at the beginning of 2015, the hostilities in Afghanistan remain ongoing as of the date of this Memorandum Opinion. Accordingly, Petitioner's detention remains lawful under the AUMF at this time.") (internal citation omitted).

[14] Recently, government counsel notified chambers and Khan's counsel that the government would likely be producing additional documents to Khan's counsel in the coming weeks, after classification review by the relevant government agencies is complete. No explanation has yet been offered as to why additional documents would need to be produced at this late stage. And neither the Court, nor Khan's counsel, is currently aware of the contents of

SECRET//NOFORN

~~SECRET//NOFORN~~

Dated: September 2, 2014

/s/
_____
JOHN D. BATES
United States District Judge

these documents, or whether and how they might be relevant to the pending motions. Because Khan's motions have already been pending for quite some time, because it is not clear that these additional documents will have any relevance to the pending motions, and because it is not clear when, if ever, any new motion from Khan's counsel might be filed in response to the government's belated production, the Court is deciding the pending motions now, in the interest of judicial efficiency.

~~SECRET//NOFORN~~