UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHAWALI KHAN, <br><br> Petitioner, <br><br> v. <br><br> BARACK H. OBAMA, et al., <br><br> Respondents. | Civil Action No.  08-1101 (JDB) |

## MEMORANDUM OPINION

Petitioner Shawali Khan was in U.S. custody from November 2002 through December 2014.  For most of that time, he was detained at the U.S. Naval Base at Guantánamo Bay, Cuba.  Since 2008, Khan and the United States have been engaged in lengthy habeas corpus proceedings, through which Khan has attempted to challenge the legality of his detention.  In December 2014, the United States relinquished custody of Khan and transferred him to the control of the government of the Islamic Republic of Afghanistan.  Because Khan is no longer in U.S. custody, the United States now moves to dismiss Khan's petition for habeas corpus as moot.  Khan opposes that motion, contending that he is still subject to significant collateral consequences due to his former detention at Guantánamo Bay, and thus that this Court retains jurisdiction to consider the merits of his petition.  However, following the D.C. Circuit's opinion in Gul v. Obama, 652 F.3d 12 (D.C. Cir. 2011), this Court concludes that the collateral consequences Khan identifies are not a sufficient injury to confer continuing jurisdiction on this Court.  Respondents' motion will therefore be granted.

## BACKGROUND

1

Khan is a citizen of Afghanistan who was captured in 2002.  Khan v. Obama, 741 F. Supp. 2d 1, 4 (D.D.C. 2010).  He was detained at the U.S. Naval Base at Guantánamo Bay from 2003 through December 2014.  Id.; Not. of Transfer [ECF No. 282].  In 2008 he filed a petition for habeas corpus, arguing that the 2001 Authorization for Use of Military Force (AUMF), Pub. L. 107-40, 115 Stat. 224 (2001), did not authorize his detention.  See Khan's Pet. [ECF No. 1]; Khan, 741 F. Supp. 2d at 4.  After two years of discovery and briefing, and a three-day evidentiary hearing, this Court determined that Khan's detention was lawful under the AUMF because he more likely than not was a "part of" Hezb-i-Islami Gulbuddin, an "associated force" of the Taliban and al-Qaeda.  Khan, 741 F. Supp. 2d at 5, 17–18.  The D.C. Circuit affirmed.  See Khan v. Obama, 655 F.3d 20 (D.C. Cir. 2011).  Khan then filed for post-judgment relief under Federal Rule of Civil Procedure 60(b) in light of new evidence that he believed demonstrated that he was not "part of" Hezb-i-Islami Gulbuddin.  See Notice of Pet.'s Mot. for Post-Judgment Relief [ECF No. 248].  This Court denied his motion.  See Khan v. Obama, No. Civ. A. 08-1101, 2014 WL 4843907, at *17–18 (D.D.C. Sept. 2, 2014); see also id. at *3–5 (further describing procedural background).

Khan then filed a renewed motion to reconsider in October 2014 after the government turned over additional materials to Khan's counsel.  See Notice of Pet.'s Renewed Mot. for Post-Judgment Relief [ECF No. 276].  Following Khan's transfer from U.S. custody in December 2014, that motion was stayed to allow Khan and his counsel time to confer, and then held in abeyance after the government filed this motion to dismiss in August 2015.  See Respondents' Mot. to Dismiss [ECF No. 295].

**LEGAL STANDARDS**

Article III of the Constitution limits the federal courts to resolving actual "Cases" and "Controversies," rather than rendering advisory opinions.  See Lexmark Int'l, Inc. v. Static Control

Components, Inc., 134 S. Ct. 1377, 1386 (2014) (quoting U.S. Const. art. III, § 2). This requirement applies "at all stages of review, not merely at the time the complaint is filed." Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997) (internal quotation mark omitted). A litigant petitioning for a writ of habeas corpus must be "in custody." See 28 U.S.C. § 2241(a), (c); Rasul v. Bush, 542 U.S. 466, 484 (2004) (holding § 2241 applies to persons held at Guantánamo Bay). When a petitioner is no longer in custody, he "must demonstrate that he was in custody at the time he filed the petition and that his subsequent release has not rendered the petition moot, i.e., that he continues to present a case or controversy under Article III, § 2 of the Constitution." Qassim v. Bush, 466 F.3d 1073, 1078 (D.C. Cir. 2006) (internal quotation marks omitted) (quoting Zalawadia v. Ashcroft, 731 F.3d 292, 297 (5th Cir. 2004)). In the context of habeas review of a domestic criminal conviction, a noncustodial petitioner may defeat mootness by demonstrating some "collateral consequence of the conviction" that is a "concrete and continuing injury other than the now-ended incarceration." Spencer v. Kemna, 523 U.S. 1, 7 (1998) (internal quotation marks omitted); see id. at 8 (explaining that the doctrine originally required a petitioner to show "concrete disadvantages or disabilities that had in fact occurred, that were imminently threatened, or that were imposed as a matter of law"); see also United States v. Juvenile Male, 564 U.S. 932, 936 (2011) (discussing mootness doctrine).

In Gul v. Obama, 652 F.3d 12 (D.C. Cir. 2011), the D.C. Circuit considered when collateral consequences alleged by former Guantánamo detainees are sufficient to defeat mootness. See also Maqaleh v. Hagel, 738 F.3d 312, 321–23 (D.C. Cir. 2013) (applying Gul). In Gul, the petitioners alleged four collateral consequences that resulted from their prior detention and designation as enemy combatants: (i) their countries of residence (Afghanistan and Sudan) imposed travel restrictions; (ii) the United States prohibited them from entering; (iii) the United States could

3

subject them to re-arrest, capture, detention, or extrajudicial killing under the law of war; and (iv) they suffered reputational harm.  Gul, 652 F.3d at 16.  The court found none of those were sufficient to defeat mootness.

The court explained that there is no presumption of collateral consequences for three prudential reasons that the Supreme Court had identified in Spencer.  First, facts sufficient to support standing "must affirmatively appear in the record" rather than be inferred.  Id. at 17 (internal quotation mark omitted) (quoting Spencer, 523 U.S. at 10–11).  Second, relying on a presumption is inappropriate in the standing context, because standing serves not as a check on litigants, but instead as a "means of defining the role assigned to the judiciary in a tripartite allocation of power."  Id. (internal quotation mark omitted) (quoting Spencer, 523 U.S. at 11).  This is especially true when applying a presumption of collateral consequences "could infringe upon the domain of the branches of government responsible" for foreign relations.  Id.  And third, because the release of Guantánamo detainees is a relatively recent phenomenon, the courts have little information regarding whether such petitioners "routinely" suffer collateral consequences. Id.

The court then concluded that the harms alleged by petitioners were too speculative or were not redressable by a court, and thus could not "sustain the exercise of federal jurisdiction."  Id. at 18.  It first explained that the travel restrictions imposed on the petitioners were not caused by a party before the court and were "therefore beyond the power of the court to redress."  Id.  It emphasized that this is especially true where travel restrictions are imposed as an "exercise of broad and legitimate discretion" by a foreign sovereign, which a court "cannot presume either to control or to predict."  Id. (internal quotation marks omitted) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 562 (1992)).  The court then explained that any harm from the United

States' restriction on the petitioner's ability to enter this country is both remote—the petitioners had not alleged that they wished or planned to travel to the United States—and also not redressable. A decision granting the requested petition would "mean only that the Government has not proven the [former] detainee more likely than not 'materially support[ed]' or was 'part of' a force associated with al Qaeda or the Taliban." Id. at 19 (second alteration original) (quoting AUMF § 2(a), reprinted at 50 U.S.C. § 1541 note). It would not remove the statutory and other legal barriers to those petitioners' entry into the United States—starting with the federal statutory requirement that "any individual who was a detainee" at Guantánamo Bay be added to the No Fly List. Id. (internal quotation mark omitted) (quoting 49 U.S.C. § 44903(j)(2)(C)(v)). Next, the court explained that the alleged collateral consequence of former detainees being subject to further harm from the United States because they are designated "enemy combatants" rather than "civilians" was too speculative, because the petitioners "ha[d] no basis whatsoever for believing the [U.S.] Government might pursue them" again. Id. at 20. Finally, the court explained that while the petitioners might suffer real reputational harm, that harm is not "susceptible to judicial correction." Id. at 21 (internal quotation mark omitted) (quoting McBryde v. Comm. to Rev. Circuit Council Conduct, 264 F.3d 52, 57 (D.C. Cir. 2001)).

## ANALYSIS

The parties agree, as they must, that Gul controls the analysis here. Khan's circumstances and allegations are not materially distinguishable from those of the Gul petitioners. As in Gul, Khan does not have the benefit of any presumption of collateral consequences. See id. at 17. There may be more publically available information today regarding the lasting effects of incarceration at Guantánamo Bay than was the case when Gul was decided in 2011. See, e.g., Charlie Savage, After Yemeni's 13 Years in Guantánamo, Freedom for the Soul Takes Longer, N.Y. Times (Jul.

29, 2016)[1]; Matt Apuzzo, et al., How U.S. Torture Left a Legacy of Damaged Minds, N.Y. Times (Oct. 9, 2016)[2]. If relevant at all, however, this only goes to the third element of the D.C. Circuit's analysis of when a presumption of collateral consequences applies; even if it were sufficient to lead to a different conclusion on that element, the first two elements of the D.C. Circuit's analysis remain unchanged.

The specific collateral consequences that Khan alleges are also similar to those in Gul. And like in Gul, they are too speculative, or not redressable by this Court, to form the basis for this Court's jurisdiction. Khan identifies three collateral consequences that he believes are sufficient to defeat mootness: (i) that his designation as part of a terrorist group makes it more difficult to regain the deeds to his family's fruit orchards and land, which were taken from his family when he was captured, Pet.'s Opp. to Mot. to Dismiss [ECF No. 299-1] at 2; (ii) that his continued designation as part of a terrorist group makes it more likely that he will harmed by the United States, as exemplified by the fact that multiple news outlets mistakenly identified a photo of him as a photo of an alleged terrorist who was killed in a U.S. airstrike, id. at 2–4; and (iii) that the Afghan government has placed restrictions on his ability to obtain a passport and therefore to travel, id. at 4. The Court will take each of these in turn.

First, Khan asserts that granting his habeas petition would help him regain the deeds to his land that was seized by Afghan forces. See Pet.'s Opp. at 2. He states that deeds to his family's land were taken when he was captured by Afghan forces, presumably in 2002. Id. Khan states that he "has petitioned the Afghan government to return the deeds for his land" and "that if this Court were to clear him and reverse its finding that he is connected to a terrorist group, he would be able to persuade the Afghan government to provide the deeds." Id. This harm is concrete,

---

[1] Available at http://www.nytimes.com/2016/07/30/world/europe/guantanamo-yemen-estonia-qader.html.
[2] Available at http://www.nytimes.com/2016/10/09/world/cia-torture-guantanamo-bay.html.

rather than speculative. But even if the Court assumes that Khan's characterization of the Afghan government's actions is accurate, Khan's harm is caused by a party not before the court—namely, the government of Afghanistan. See Gul, 652 F.3d at 18. If the Afghan government were to impose this consequence "as a matter of law" due to this Court's prior finding that Khan was a part of Hezb-i-Islami Gulbuddin, then this injury might be sufficiently redressable to defeat mootness. See Spencer, 523 U.S. at 7–8 (describing original version of collateral consequences doctrine which required "concrete disadvantages . . . that were imposed as a matter of law"). But Khan does not make that claim. To the contrary, by stating that "he would be able to persuade the Afghan government to provide the deeds," Pet.'s Opp. at 2, he implies that it is a matter of the Afghan government's discretion—and thus entirely outside of this Court's power to remedy. See Gul, 652 F.3d at 18.

Second, Khan asserts that his "terrorist designation has continued to expose him to real dangers following his release." Pet.'s Opp. at 2. He does not fully explain what dangers he is referring to, but as an example he notes that in February 2015 several prominent news outlets, including the New York Times and CNN, ran his picture and identified him as Mullah Abdul Rauf Khadim, a recruiter for the Islamic State in Afghanistan, who was killed in a U.S. airstrike. See id. at 2–3 (citing, inter alia, Taimoor Shah & Joseph Goldstein, The Afghan Militant in the Photo? The Wrong Man, and He's Not Happy, N.Y. Times (Feb. 16, 2015)[3]). Khan states that the photo was supplied to these news organizations by the Afghan National Directorate of Security, and that the error "was made possible because Khan is still categorized as a person with links to terror groups." Id. at 4. He also states that his "life was put in serious jeopardy by the publication of his photo as the terrorist targeted in an airstrike." Id. It is unclear what harm Khan believes stems

---

[3] Available at http://www.nytimes.com/2015/02/17/world/asia/mullah-abdul-rauf-khadim-shawali-khan-photo.html.

from these mistaken articles identifying him as a deceased terrorist. He might believe that U.S., Afghan, or other government forces or private individuals may now mistakenly believe that he is Khadim (the deceased terrorist), and therefore try to harm him after seeing him and believing that Khadim was not in fact killed in an airstrike. Alternatively, he might believe that his prior detention at Guantánamo Bay means that in the future he is likely to again be mistakenly identified as a terrorist. But these harms are too speculative to support jurisdiction. See Gul, 653 F.3d at 20. As was also true in Gul, there is no evidence that the United States, or any other government or individual, mistakenly believes that Khan is Khadim, much less that any entity is targeting him for that reason. See id. Moreover, Khan presents no information as to why being once mistaken for Khadim means he is more likely to be mistaken for a different alleged terrorist in the future.

Instead, Khan's theory of harm might be that his reputation has suffered from being mistakenly identified as Khadim. Even if the Court assumes that these instances of mistaken identity were caused by Khan's detention at Guantánamo Bay, any reputational harm that flows from that is not "susceptible to judicial correction." Id. at 20.

Third, Khan asserts that he "cannot obtain a passport" from the Afghan government "as long as there is an official court finding that he is connected to terrorist groups." Pet.'s Opp. at 4. In particular, he states that he sustained hearing loss as a result of "loud blaring music" used "during interrogations, mostly at CIA facilities before [he] was sent to Guantanamo." Id. According to Khan, "[t]he Afghan government has told [him] it will arrange treatment" at a facility in India. Id. However, he cannot travel to India without a passport. Assuming that Khan's statements are accurate, the Court is sympathetic to the pickle in which Khan seemingly finds himself: he is unable to receive medical treatment for injuries allegedly sustained while in U.S. custody because of his history of being held in U.S. custody. However, this injury is not

8

redressable by a federal court.  Gul, 652 F.3d at 18.  As explained in Gul, travel restrictions imposed by a foreign government are not only not caused by a party before the court and "therefore beyond the power of the court to redress," but also are part of the "broad and legitimate discretion" of a foreign sovereign which a court "cannot presume either to control or to predict."  Id. (internal quotation mark omitted).

      Finally, Khan raises an alternative argument.  He asserts that the government intentionally withheld exculpatory evidence until September 2014, just before releasing him from custody, so as to thwart Khan's and the Court's ability to properly adjudicate the merits of his petition.  He argues that this is a sufficient legal ground to defeat mootness, and that to conclude otherwise would incentivize the government to improperly delay releasing exculpatory evidence in future cases.  Pet.'s Opp. at 5.  However, Khan does not cite any case law that supports his position that even an intentional and improper delay provides lawful grounds for this Court to retain jurisdiction.  While that exact question has not been decided by the Supreme Court in the context of 28 U.S.C. § 2241, which pertains to Guantánamo Bay detainees, it has been decided in the context of habeas corpus review of a state court conviction under 28 U.S.C. § 2254.  In Spencer, the Supreme Court rejected a similar argument, explaining that while the "petitioner argues that, even if his case is moot, that fact should be ignored because it was caused by the dilatory tactics of the state attorney general's office," that is not legally relevant: "mootness, however it may have come about, simply deprives us of our power to act[.]"  Spencer, 523 U.S. at 18; see also Rimi v. Obama, 60 F. Supp. 3d 52, 59 (D.D.C. 2014), aff'd, 608 F. App'x 4 (D.C. Cir. 2015) (nonprecedential) (same, in the § 2241 context).  But the Court need not decide today whether a delay in disclosing exculpatory evidence could ever defeat mootness.  Here, it is sufficient to note that the government appears to have made a good faith effort to keep the Court and Khan's counsel informed about new evidence

as it became available.  See Khan, 2014 WL 4843907, at *20 n.14.  Thus, even if the Court were to assume that an intentional delay could defeat mootness in some circumstances, it certainly does not do so here.

## CONCLUSION

For these reasons, respondents' motion to dismiss will be granted.  Petitioner's renewed motion for post-judgment relief will be denied.  A separate order has been issued on this date.

/s/<br>
JOHN D. BATES<br>
United States District Judge

Dated: October 25, 2016